GEORGE L. CARNEY, JR., & others[1] vs. ATTORNEY GENERAL
& another.[2]

Suffolk. May 7, 2008. - July 15, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, CORDY, & BOTSFORD, JJ.

*Initiative. Constitutional Law,* Initiative petition, Eminent domain. *Eminent Domain. Attorney General. Administrative Law,* Official notice. *Dog. Racing.*

This court accepted as reasonable the Attorney General's determination of facts that she considered in certifying a proposed initiative petition pursuant to art. 48 of the Amendments to the Massachusetts Constitution, where the information that the Attorney General declined to notice had not been officially verified or adjudicated by the commission in question; where retrieving information from all the State agencies that might be implicated in all the initiative petitions that the Attorney General is required to evaluate would involve undue delay which might frustrate the initiative process; and where, in the instant case, the Attorney General's determination of the merits of the plaintiffs' challenges to the petition would not change on consideration of the additional facts that the plaintiffs suggested that she should notice. [807-810]

The Attorney General properly certified a proposed initiative petition to ban parimutuel dog racing, where the petition would eliminate the possibility of dog racing not only in places where it was currently in effect or authorized, but also throughout the Commonwealth, and thus was not a local matter excluded from the initiative process under art. 48 of the Amendments to the Massachusetts Constitution. [810-813]

This court concluded that the Attorney General properly certified, pursuant to art. 48 of the Amendments to the Massachusetts Constitution, that a proposed initiative petition to ban parimutuel dog racing would not necessarily effect a regulatory taking of the plaintiffs' tangible property (i.e., real property and facilities at a dog racing track), where the facts available to the Attorney General at the certification stage did not permit an adequate determination of the potential residual use of the plaintiffs' property or of the diminution in the property's value as a result of the proposed regulation [813-814]; further, the plaintiffs failed to demonstrate a compensable property interest in certain intangible property (i.e., their expectation of renewal of their racing licenses) that would be affected by the proposed initiative petition [814-817].

The Attorney General properly certified that a proposed initiative petition to

[1]Laetitia A. Carney, Maura J. Carney, and Gary M. Temple.

[2]Secretary of the Commonwealth.

ban parimutuel dog racing in the Commonwealth, which imposed a civil penalty of not less than twenty thousand dollars for its violation, was not inconsistent with the right of trial by jury, where the proposed legislation was open to an interpretation that would make a jury trial available [817-818]; further, the plaintiffs challenging the Attorney General's certification failed to demonstrate that the petition, by failing to specify a maximum penalty, effected an unconstitutional delegation of legislative authority in violation of the principles of separation of powers contained in art. 30 of the Massachusetts Declaration of Rights [818-821].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 21, 2008.

The case was reported by *Ireland*, J.

*Joel A. Kozol* (*Lee H. Kozol & Marc D. Rie* with him) for the plaintiffs.

*Peter Sacks*, Assistant Attorney General, for the defendants.

*Abby F. Rudzin, Anne J. Savage, & Luke Sosnicki,* of New York, *& Ann P. Hochberg*, for Committee to Protect Dogs & another, amici curiae, submitted a brief.

BOTSFORD, J. This case involves the latest round in an ongoing struggle between supporters of parimutuel dog racing[3] and a coalition of citizen groups seeking to outlaw such racing in the Commonwealth through a ballot initiative petition. See art. 48, The Initiative, Parts II & V, of the Amendments to the Constitution of the Commonwealth.[4] The plaintiffs, four Massachusetts voters,[5] filed suit in the county court to quash the Attorney General's certification of Initiative Petition 07-06, entitled "An Act to protect greyhounds" (petition), and to enjoin the Secretary of the Commonwealth (Secretary) from placing the petition on the 2008 Statewide ballot. If approved by a majority of voters, the proposed law would eliminate parimutuel dog racing by repealing those provisions of G. L. c. 128A that currently regulate and provide for licensing of the parimutuel dog racing industry.

In 2000, the voters rejected an initiative petition to ban parimutuel dog racing identical in substance to the petition at is-

---

[3]Parimutuel dog racing is dog racing that permits wagering or betting on the dogs.

[4]Unless otherwise stated, all references to art. 48 refer to art. 48 as amended by arts. 74, 81, and 108 of the Amendments to the Massachusetts Constitution.

[5]See *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 517 n.4 (2000).

sue here, by a vote of 48.59% against, 46.70% in favor, and 4.71% blank.[6] In 2006, this court considered a challenge brought by the same plaintiffs as in this case to an initiative petition entitled "An Act to protect dogs." *Carney* v. *Attorney Gen.*, 447 Mass. 218, 219 (2006) (*Carney I*). In *Carney I*, the court agreed with the plaintiffs that the proposed law, which included provisions to ban parimutuel dog racing along with provisions to "broaden[] criminal statutes that penalize dog fighting and the general neglect and abuse of dogs," *id.*, violated the "relatedness" limitation on the initiative process outlined in art. 48. *Id.* at 219-220. The court therefore enjoined the Secretary from placing that petition on the 2006 ballot. *Id.* at 232.

Renewing their efforts, the organizational proponents of the 2006 initiative petition (proponents)[7] have submitted the instant petition, which corrects the relatedness problem by focusing solely on parimutuel dog racing. We therefore now have occasion to consider two issues raised by the plaintiffs in *Carney I* that we found unnecessary to reach in that case: whether the proposed law violates the "local matters" limitation on the initiative petition process, and whether the law is inconsistent with the right to receive compensation for private property appropriated to public use. See *id.* at 219-220. The plaintiffs also claim that the petition is inconsistent with the right of trial by jury and that its provision of a fine without a specified maximum amount represents an unconstitutional delegation of legislative authority and is therefore beyond the power of the people to enact through the initiative process. Finally, the plaintiffs argue that the Attorney General, in certifying that the proposed law does not contain any matters excluded under art. 48, failed to discharge her constitutional duty as gatekeeper by refusing to take official notice of certain information within the files of State agencies.

We conclude that the Attorney General's certification of the

---

[6]The 2000 petition was placed on the ballot without facing any challenge in this court to the Attorney General's certification.

[7]The Committee to Protect Dogs, comprising the Massachusetts Society for the Prevention of Cruelty to Animals (MSPCA); GREY2K USA, Inc.; and the Humane Society of the United States (HSUS), organized the effort to file both the 2006 petition and the petition at issue in this case. We acknowledge the amicus brief in support of the defendants filed on behalf of the Committee to Protect Dogs and HSUS.

petition was proper. We therefore remand the case to the county court for the entry of a judgment denying the plaintiffs' request for relief in the nature of certiorari and mandamus.

1. *Background.* We summarize the record submitted by the parties pursuant to the single justice's reservation and report.

The petition would put an end to parimutuel dog racing in the Commonwealth by amending the regulatory scheme set out in G. L. c. 128A so that it applies only to horse racing. The proposed law would prohibit dog races "where any form of betting or wagering on the speed or ability of dogs occurs"; would prohibit the State Racing Commission (commission) from "accepting or approving any application or request for racing dates for dog racing"; and would impose, for any violation of the dog racing ban, "a civil penalty of not less than twenty thousand dollars" payable to the commission for its administrative purposes subject to appropriation. The effective date of the proposed law is January 1, 2010.

As of that date, G. L. c. 128A will permit dog racing to be licensed at three tracks in the Commonwealth (no two in the same county or within twenty-five miles of each other), as well as at major State or county fairs. See G. L. c. 128A, § 3 (*i*).[8] However, there appears to have been no racing at fairs since 1981, and there are presently only two tracks in operation: Wonderland Greyhound Park in Suffolk County and Raynham-Taunton Dog Track (Raynham Track) in Bristol County. At least some of the plaintiffs in this action are shareholders or directors of two companies, Massasoit Greyhound Association, Inc. (Massasoit), and Taunton Dog Track, Inc. (Taunton), each licensed by the commission to conduct parimutuel dog racing meetings at Raynham Track. See *Carney I*, 447 Mass. at 222-223, 224 n.17. Massasoit owns Raynham Track and has been licensed

---

[8]References throughout this opinion are to the version of G. L. c. 128A that was in effect prior to 2001 and will resume effect as of December 31, 2008, that is, G. L. c. 128A, as amended through St. 1990, c. 150, § 305. The version of c. 128A that is currently in effect includes changes enacted in 2001 by St. 2001, c. 139, which are scheduled to expire on December 31, 2008. See St. 2006, c. 449, § 19, amending St. 2001, c. 139, § 45. Thus, in the absence of further extensions of the current version of c. 128A, the pre-2001 version of c. 128A will be in place when the petition is scheduled to take effect if enacted.

there for over fifty years; Taunton has been licensed there (as a lessee) since 1986 and was previously licensed for twenty-five years to conduct races elsewhere in the Commonwealth. Licensees must apply for renewal licenses on a yearly basis. G. L. c. 128A, § 2. No entity other than Massasoit, Taunton, or the operators of Wonderland Park has filed an application for a license to conduct dog races at a track since 1961.

In August, 2007, at least ten qualified voters filed the petition at issue here with the Attorney General. See art. 48, The Initiative, Part II, § 3. On September 5, 2007, the Attorney General certified that the petition is in proper form for submission to the people; that the measure is not substantially the same as any measure qualified for submission or submitted to the people at either of the two preceding biennial State elections; and that it contains only subjects which are related or mutually dependent and are not excluded from the popular initiative. See *id.* On receipt of the Attorney General's certification, the Secretary prepared and distributed blank signature forms for circulation by the proponents. See *id.* On or before the first Wednesday in December, 2007, the proponents submitted to the Secretary the additional signatures required for submission of the petition to the Legislature, and the Secretary transmitted the petition to the clerk of the House of Representatives on January 8, 2008. See art. 48, The Initiative, Part II, § 4, and Part V, § 1. As of the date of the parties' statement of agreed facts, the Legislature had not enacted the law proposed by the petition. The Secretary has stipulated that if the proponents submit sufficient additional signatures by the first Wednesday in July, 2008, he intends to include the proposed law, as set forth in the petition, in the Information for Voters Guide being printed this summer and to submit the proposed law to the people at the 2008 Statewide election in November. See art. 48, The Initiative, Part V, § 1.

The plaintiffs filed their complaint for certiorari and mandamus in the county court on February 21, 2008. The single justice reserved and reported the case to the full court on the complaint, the statement of agreed facts, and other documents. We refer to additional information contained in the statement of agreed facts as it is relevant to the issues raised by the plaintiffs.

2. *Scope of Attorney General's official notice.* The plaintiffs

initially challenge the procedure followed by the Attorney General in certifying the petition pursuant to art. 48, The Initiative, Part II, § 3. In considering whether to certify the petition, the Attorney General took official notice of certain facts gleaned primarily from the commission's annual report for 2006, including State revenue figures for greyhound racing; the fact that dog racing is currently occurring at two race tracks in the Commonwealth; and the fact that Massasoit and Taunton were both licensed to operate parimutuel dog racing meetings with associated simulcast rights during 2007 and had been so licensed in prior years. The plaintiffs argue that the Attorney General, in fulfilment of her constitutional duty as gatekeeper for initiative petitions, should also have taken official notice of additional information within the public files of State agencies that are her "clients." In particular, they contend that she should have noticed information contained in applications for racing licenses on file with the commission (indicating the long-standing status of Massasoit and Taunton as two of only three companies operating dog races in the Commonwealth, as well as those companies' investments in improvements to the facilities at Raynham Track), and information available from the Department of Agricultural Resources (regarding the recent lack of racing at State or county fairs and the number of fairs eligible to conduct racing under existing law). The plaintiffs argue that this additional information would have altered the Attorney General's determination whether the proposed law is excluded from the initiative process as a local matter or as inconsistent with the right to receive compensation for property appropriated to public use.[9] Although we agree with the Attorney General that the additional facts the plaintiffs claim she should have noticed would not show that the petition contains any excluded matters, the parties have briefed the procedural issue, and we address it in order further to clarify the Attorney General's duty.

This court has considered the Attorney General's duty of factual review in a case involving a challenge to an initiative petition that proposed to ban nuclear power generation in the Commonwealth. In *Yankee Atomic Elec. Co.* v. *Secretary of the*

---

[9]We address the merits of these two challenges to the petition in parts 3 and 4, *infra.*

*Commonwealth*, 402 Mass. 750, 756 (1988) (*Yankee I*), the court held that the Attorney General is required to "consider a petition's factual impact in determining whether to certify that a petition does not contain excluded subjects." Thus, while the Attorney General "is not to become involved with holding extensive hearings to determine the full factual impact of a petition," *id.* at 758, she should consider "the apparent factual impact flowing from a petition's language" as well as "facts which can be officially noticed." *Id.* at 759. The court explained that "[o]fficial notice includes matters subject to judicial notice, as well as additional items of which an agency official may take notice due to the agency's established familiarity with and expertise regarding a particular subject area." *Id.* at 759 n.7.

In *Yankee I*, the court directed the Attorney General to reexamine the petition at issue after a factual review. *Id.* at 760. In carrying out that review, the Attorney General took official notice of various facts, including that the plaintiffs in the case operated the only two nuclear plants in Massachusetts, held Federal licenses to operate them, and had invested money to build the plants; the Attorney General then affirmed his certification of the petition. *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 403 Mass. 203, 206-207 & n.6 (1988) (*Yankee II*). The court in *Yankee II* upheld that certification and the content of the Attorney General's review, noting that "in assessing the extent of the facts subject to his official notice . . . we will defer to the Attorney General's reasonable determinations," *id.* at 207, because "the person best qualified to determine the extent of his expert knowledge is the Attorney General." *Id.* at 208.

The plaintiffs here argue that the Attorney General, as legal representative of the Commonwealth's various administrative agencies, does not possess her own expertise in any given regulatory field. Thus, they claim that if *Yankee I*'s mandate that she consider officially noticeable facts is to have any meaning, it must require her to notice facts within the expertise and files of the agencies she represents.

We read *Yankee I* and *Yankee II* together to require the Attorney General to draw a reasonable line somewhere between conducting a searching factual investigation that would "encumber the initiative process," *Yankee I*, 402 Mass. at 758, and

merely reading the face of the petition while ignoring its factual impact. It appears that here the Attorney General noticed certain facts contained in the commission's official publications and declined to notice information contained in applications on file with the commission or available through public records requests from the commission or the Department of Agricultural Resources. The Attorney General explains this decision by noting that (1) while she has no reason to doubt the accuracy of information contained in racing license applications, those facts have not been officially verified or adjudicated by the commission; (2) retrieving information from all the State agencies that might be implicated in all the initiative petitions she is required to evaluate in a short time each election cycle would "involve undue delay which might frustrate the initiative process," *id.* at 759; and (3) in this case, her determination of the merits of the plaintiffs' challenges would not change on consideration of the additional facts the plaintiffs suggested she should notice. Under the deferential standard set out in *Yankee II*, "we accept as *reasonable* the Attorney General's determination of the facts [she] has considered in [certifying] the petition" (emphasis in original). *Yankee II*, 403 Mass. at 208.

3. *Local matters exclusion.* The plaintiffs argue that the proposed law is excluded from the initiative process because it "takes dead aim" at the only two localities where dog racing currently exists or is likely to exist in the foreseeable future.

As noted *supra*, in forwarding a petition to the Secretary, the Attorney General must certify, inter alia, that it "contains only subjects not excluded from the popular initiative." Art. 48, The Initiative, Part II, § 3. Section 2, entitled "Excluded Matters," contains the limitation that "[n]o measure . . . the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be proposed by an initiative petition." The plaintiffs argue that although the proposed law, on its face, would ban dog racing anywhere in the Commonwealth, the Attorney General's duty under *Yankee I* to consider the factual impact of a petition prevents her from certifying a petition that would have an immediate practical effect only in two places. They also claim that, as a legal matter, the Legislature has "localized" the issue of dog

racing by restricting the number of tracks and their geographical proximity to one another, G. L. c. 128A, § 3 (*i*), and by making the allowance and location of dog racing subject to certain local controls.

This court's cases have made clear that "[t]he particular districts or localities exclusion of the initiative provisions of art. 48 does not require that a proposed statute have uniform, Statewide application." *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 224 (1981) (rejecting local matters challenge to Proposition 2½). Rather, the purpose of the limitation is "to exclude from the initiative process legislation having only a regional impact," that is, legislation that "affects only one political subdivision or only particular districts or localities and thus addresses a parochial concern." *Id.* See *Christian* v. *Secretary of the Commonwealth*, 283 Mass. 98, 104 (1933), quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 703 (1918) ("The whole purpose of this 'Excluded Matter[]' is to exclude matters that are not of State wide interest, those that relate merely to a particular town or city"). Thus, "[w]here a law has no local or regional focus and where it makes no specific provision for the inclusion or exclusion of any city or town or of any particular district or locality, either on its face or in its application, the fact that the law may have different effects in various municipalities in a geographically random way does not exclude the measure from the initiative process." *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth, supra* at 225. "A proposed act, which on its face applie[s] uniformly to all municipalities in the Commonwealth, is not excluded from the initiative process 'even though . . . it may . . . effect[] a change of the [existing] law for [one city] only.'" *Ash* v. *Attorney Gen.*, 418 Mass. 344, 348 (1994) (*Ash*), quoting *Opinion of the Justices*, 300 Mass. 602, 605 (1938). See *Mount Washington* v. *Cook*, 288 Mass. 67, 74 (1934) ("the restriction to a particular town, city or other political subdivision or to particular districts or localities must be specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth, in order that the law be an excluded matter").

The court's decision in *Ash, supra*, is on point. In that case,

the court rejected a local matters challenge to an initiative petition that proposed to eliminate rent control in Massachusetts, even though only seven designated municipalities had received authorization from the Legislature to adopt some form of rent control or review. *Id.* at 347 n.7. As the court pointed out, "[t]he rent control ban contained in the act, by its terms, applies to every municipality in the Commonwealth." *Id.* at 348. The plaintiffs argue that prior to the proposal at issue in *Ash*, every municipality had the right to request through a home rule petition, art. 89, § 8 (1), of the Amendments to the Constitution of the Commonwealth, legislative enactment of a special law authorizing it to adopt rent control; thus, the *Ash* petition eliminated the possibility of rent control not only in places where it was currently in effect or authorized, but also throughout the Commonwealth. The plaintiffs fail to apprehend, however, that the same can be said of the petition at issue in this case. Indeed, the effect of this petition would be broader, because the statute as it will exist at the time the proposed law would take effect permits (duly licensed) dog races to be conducted at any of a great many localities in the Commonwealth. That the present *economic* realities of the industry might make this prospect unlikely to materialize is irrelevant; the proposed law would change the *legal* status of dog racing Statewide.

*Ash* also speaks to the plaintiffs' related argument that the Legislature has made dog racing subject to local control and thus removed it from the arena of Statewide legislation. In *Ash*, the court pointed out that "[i]t is within the power of a municipality to enact a rent control program only when the Legislature has explicitly delegated that power to the municipality. Thus, rent control is an issue of Statewide concern." *Ash*, 418 Mass. at 348. Similarly, the authority to conduct races at which gambling occurs — otherwise a crime at common law and by statute[10] — exists only by virtue of legislative authorization; a municipality cannot allow forms of gambling not authorized by the Legislature, and gambling allowed by the Legislature "can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare." *Selectmen of*

---

[10]See, e.g., *Commonwealth* v. *Goodall*, 165 Mass. 588, 592 (1896); G. L. c. 139, §§ 14-15; G. L. c. 271, § 17.

*Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 315 (1949). Moreover, apart from the granting of limited local veto authority, the Legislature has retained State-level regulation of the parimutuel dog racing industry through the commission. G. L. c. 128A. Thus, parimutuel dog racing, like landlord-tenant relations, constitutes a matter of Statewide concern, and "[w]e do not question the power of the Legislature and the people through the initiative process to abolish animal racing involving betting or wagering . . . ." *Carney I*, 447 Mass. 218, 231 n.22 (2006).

4. *"Takings" issue.* The plaintiffs also contend that the Attorney General erred in certifying, pursuant to art. 48, The Initiative, Part II, §§ 2 & 3, that the petition is not "inconsistent with . . . [t]he right to receive compensation for private property appropriated to public use." In essence, the plaintiffs claim that the proposed law would effect a taking of their property without compensation. In support of this claim they assert that the proposed law constitutes (1) a regulatory taking of their real property and facilities at Raynham Track, and (2) a categorical taking of their expectation of renewal of their racing licenses. We address each theory in turn.

In *Yankee II*, we noted that "regulatory takings analysis . . . is peculiarly fact dependent, involving 'essentially ad hoc, factual inquiries.' " *Yankee II*, 403 Mass. 203, 209 (1988), quoting *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978). As a general matter, in determining whether a regulation "goes too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 415 (1922), and results in a compensable taking of property, we look at "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " *Leonard* v. *Brimfield*, 423 Mass. 152, 154 (1996), quoting *Connolly* v. *Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986). The claim in *Yankee II* was that a proposed ban on nuclear power generation would effect a regulatory taking of the plaintiffs' property, namely, their nuclear reactor sites and facilities. *Yankee II*, 403 Mass. at 206 n.6 & 209. The court concluded that "at least some of the relevant inquiries which may arise in the ultimate determination whether a taking of property has occurred will involve the kind

of lengthy factual determination which art. 48 does not require or allow to the Attorney General at this time." *Id.* at 209. Because "undetermined factual issues . . . [led] to reasonable, not frivolous, contentions that the petition [did] not necessarily effect a regulatory taking," *id.* at 210, and in light of "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws," *id.* at 211, the court held that "it was reasonable and proper for the Attorney General to [certify the petition]." *Id.*

The considerations that informed the outcome of *Yankee II* are equally relevant here. As in that case, the facts available to the Attorney General at the certification stage do not permit an adequate determination of the potential residual use of the plaintiffs' real and personal property or the diminution in the property's value as a result of the proposed regulation.[11] See *id.* at 209-210 & n.7. We therefore conclude that the Attorney General properly certified that the proposed law does not necessarily effect a regulatory taking of the plaintiffs' tangible property. It of course remains open to the plaintiffs to challenge the law on regulatory takings grounds after its adoption, "on appropriate proof and following the necessary factual resolutions." *Id.* at 212 n.9.

The plaintiffs' second takings theory focuses on their licenses. The plaintiffs contend that the proposed law would constitute a taking of their expectation of continued renewal of their racing licenses, for which they must apply annually. The plaintiffs assert a compensable property interest in this expectation by pointing out that the commission's discretion to deny renewal applications is restricted by a duty to consider, among other factors, "fair treatment of the economic interests . . . and investments

---

[11] Although the plaintiffs claim that banning dog racing would render their property valueless, that contention is clearly inaccurate. In determining the postregulation value of the plaintiffs' property, a court would focus on "the affected site[] as a whole," *Yankee II*, 403 Mass. 203, 211 n.8 (1988), and would not "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Moskow* v. *Commissioner of Envtl. Mgt.*, 384 Mass. 530, 533 (1981), quoting *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 130 (1978). The plaintiffs' property as a whole would have at least some residual value: they could sell their equipment to other racing establishments or dog-related businesses, and they could sell the real property and facilities or redevelop them for other uses.

of those who in good faith have provided and must maintain [racing] facilities." *Bay State Harness Horse Racing & Breeding Ass'n* v. *State Racing Comm'n,* 342 Mass. 694, 700 (1961). They also cite a variety of cases that have found a property interest in government-issued licenses. We conclude, however, that whatever interest the plaintiffs may have in their licenses, it does not entitle them to compensation in the event that legislation duly enacted by either the Legislature or the people eliminates all parimutuel dog racing in the Commonwealth.

The plaintiffs correctly point out that the United States Supreme Court has recognized the potential for property interests to arise in intangible benefits. See *Regents of State Colleges* v. *Roth,* 408 U.S. 564, 577 (1972). While the existence of a property interest in a benefit may give the holder a right to a hearing before the interest is taken away as a matter of procedural due process, see *Perry* v. *Sindermann,* 408 U.S. 593, 603 (1972), that does not necessarily mean that the interest is of the kind that entitles the holder to compensation under the takings clause of the Fifth Amendment to the United States Constitution (or art. 10 of the Massachusetts Declaration of Rights). See, e.g., *Pro-Eco, Inc.* v. *Commissioners of Jay County,* 57 F.3d 505, 513 (7th Cir.), cert. denied, 516 U.S. 1028 (1995) ("[P]roperty as contemplated by the Takings Clause and property as contemplated by the Due Process Clause cannot be coterminous. . . . The Due Process Clause . . . recognizes a wider range of interests as property than does the Takings Clause"); *Corn* v. *Lauderdale Lakes,* 95 F.3d 1066, 1075 (11th Cir. 1996), cert. denied, 522 U.S. 981 (1997) (" 'Property' as used in the Just Compensation Clause is defined much more narrowly than in the due process clauses"). Because the initiative process and the Statewide election will satisfy the requirements of procedural due process with respect to the plaintiffs' property interests in their licenses,[12] it is the latter question — right to compensation — that concerns us here.

---

[12]See *Bi-Metallic Inv. Co.* v. *State Bd. of Equalization of Colo.,* 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule"). Cf. *Connecticut Dep't of Pub. Safety*

The plaintiffs cite *Members of the Peanut Quota Holders Ass'n* v. *United States*, 421 F.3d 1323 (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006) (*Peanut Quota Holders*), in support of their argument. In that case, the United States Court of Appeals for the Federal Circuit reviewed a series of United States Supreme Court and United States Court of Appeals cases concerning alleged takings of intangible interests, and concluded that "a compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude." *Id.* at 1331. On evaluating these three factors, the court determined that the holders of the peanut quotas at issue in that case did have "a property interest cognizable under the Fifth Amendment." *Id.* at 1334. However, the court went on to hold that the plaintiffs were not due any compensation as a result of Congress's "tak[ing] steps that render the quotas less valuable, or even valueless . . . because the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits [in the form of a monetary subsidy] to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election." *Id.*

Applying the *Peanut Quota Holders* analysis leads us to the conclusion that the plaintiffs here have no compensable property interest in their racing licenses. It is true that there is no "express statutory language precluding the formation of a property right" in racing licenses, and the licenses are transferable, albeit with the approval of the commission. G. L. c. 128A, § 3 (*m*). However, contrary to the plaintiffs' assertion, the licenses lack the essential attribute of exclusivity. Indeed, the *Peanut Quota Holders* court emphasized the general nonexclusivity of a license: "A license represents a limited suspension of the otherwise general restrictions imposed by the government . . . . Each additional license dilutes the value of the previously issued licenses. So long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants

v. *Doe*, 538 U.S. 1, 8 (2003) (Scalia, J., concurring) ("the categorical abrogation of [a] liberty interest by a validly enacted statute suffices to provide all the process that is 'due' ").

is indeterminate. Such a license is by its very nature not exclusive." *Id.* at 1333-1334. The racing licenses at issue here are not exclusive: the plaintiffs lack the power to prevent other market entrants from obtaining licenses to conduct races at fairs or at an additional track (or more, if the Legislature should amend the statute). Moreover, even if we were to conclude that the licenses did "have aspects of property," *id.* at 1334, the *Peanut Quota Holders* case teaches that such a right is not subject to compensation where the government chooses to modify the program that created the benefit in the first place. *Id.* at 1335 ("Since Congress at all times retains the ability to amend statutes, a power which inheres in its authority to legislate, Congress at all times retains the right to revoke legislatively created entitlements").

Finally, it is worth pointing out that gambling on dog races is a heavily regulated industry that only exists by virtue of legislatively created narrow exceptions to common-law and statutory bans and that, "because of the nature of the business[, it] can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare." *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 315 (1949). "Although mere 'participat[ion] in a heavily regulated industry' does not bar a plaintiff from ever prevailing on a takings claim, . . . it does greatly reduce the reasonableness of expectations and reliance on regulatory provisions." *Conti* v. *United States*, 48 Fed. Cl. 532, 537 (2001), aff'd, 291 F.3d 1334 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003). See *Mitchell Arms, Inc.* v. *United States*, 7 F.3d 212, 216 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994), quoting *Mitchell Arms, Inc.* v. *United States*, 26 Cl. Ct. 1, 5 (1992) (rejecting claim for compensation on revocation of license to import assault rifles because "a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control").

We conclude that on the basis of the factual review that she appropriately conducted at the certification stage, the Attorney General did not err in certifying that the petition is not inconsistent with the right to receive compensation for private property appropriated to public use.

5. *Right of trial by jury.* Under art. 48, The Initiative, Part II,

§§ 2 and 3, the Attorney General is also required to certify that an initiative petition is not "inconsistent with . . . the right of trial by jury." The law proposed by the petition imposes a "civil penalty of not less than twenty thousand dollars" for violations of the dog racing ban, "which shall be payable to the commission and used for administrative purposes of the commission subject to appropriation." The plaintiffs claim this provision violates the exclusion of matters inconsistent with the right of trial by jury because it is punitive in nature and is intended to be imposed by the commission, where the jury trial guaranteed to criminal defendants would not be available. Without reaching the question whether the provision is indeed punitive, we conclude that the Attorney General did not err in certifying the petition. Because the language of the civil penalty provision in the proposed law can be read to mean that the penalty is to be imposed by (or at least may be imposed by) a court, in a proceeding where a jury would be available, the provision is not inconsistent with the right of trial by jury.

The plaintiffs assert that "[i]f a jury trial were desired, the legislation could say so" and that "[i]t would be anomalous . . . to attribute to the drafters a purpose, not articulated, to impose a right to a jury trial." The question, however, is not whether the legislation "imposes" a jury right, but whether it *precludes* a jury trial otherwise guaranteed by the Constitution. As the plaintiffs acknowledge, courts interpret statutes to be consistent with the Constitution whenever possible. See *Commonwealth* v. *Lammi*, 386 Mass. 299, 301 (1982). Because the proposed legislation is open to an interpretation that would make a jury trial available if constitutionally required, it is not "inconsistent with . . . the right of trial by jury." The Attorney General's certification on this point was proper.

6. *Delegation of legislative authority.* The plaintiffs contend that the proposed law, by authorizing imposition of a penalty of "not less than" $20,000, and failing to specify a maximum penalty, would effect an unconstitutional delegation of legislative authority in violation of the principles of separation of powers enshrined in art. 30 of the Massachusetts Declaration of Rights.[13] The final paragraph of art. 48, The Initiative, Part II, § 2, titled "Excluded

[13]In support of their position that the provision represents an unconstitutional

Matters," reads, "The limitations on the legislative power of the general court in the constitution shall extend to the legislative power of the people as exercised hereunder." The plaintiffs contend that, because of this language's placement in the "Excluded Matters" section, the Attorney General's duty to certify that an initiative petition contains no subjects "excluded from the popular initiative," § 3, encompasses a duty to ensure that a proposed law would not be unconstitutional in any way. The plaintiffs therefore argue that the Attorney General's certification of the petition in this case was improper because it implicitly included a certification — erroneous in their view — that the proposed law would not effect an excessive delegation of legislative authority.

Despite the presence of the "limitations on the legislative power" provision at the end of the "Excluded Matters" section of art. 48, this court has consistently declined to entertain pre-enactment challenges to initiative petitions grounded in allegations of constitutional infirmities other than those enumerated in the first four paragraphs of that section. See, e.g., *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 246-247 (1946) (*Bowe*). In *Bowe*, the court explained one reason for this rule: "Only when the impact of a statute upon particular individuals, who have both the opportunity and the incentive to defend their rights by argument, and upon a set of definite facts established after genuine controversy, has been shown, can a court decide a constitutional question with confidence that relevant considerations have not been overlooked." *Id.* at 246. Accepting this consideration, the plaintiffs urge us to limit *Bowe*'s reach to cases in which the constitutionality of a proposed law depends on its application, and to hold that the Attorney General may and must decline to certify a petition when "no set of facts . . . would save the constitutionality of the measure," so as to avoid "a needless waste of resources."

---

delegation, the plaintiffs point to *Commonwealth* v. *Diaz*, 326 Mass. 525, 528 (1950), in which the court said in dicta that "[h]ad the statute [in question] attempted to [authorize the commissioner to fix such penalties as he saw fit] we have no doubt that it would have been an excessive delegation of power." The plaintiffs distinguish *Commonwealth* v. *Haseotes*, 356 Mass. 230, 237 (1969) (upholding judge's imposition of minimum penalty where statute failed to specify maximum, on assumption that "there may have been a drafting inadvertence which legislative amendment appropriately can overcome"), by arguing that the proponents' long and focused attention on the petition precludes the possibility of a "drafting inadvertence."

The plaintiffs' argument, however, ignores the fact that the holding of *Bowe* is not grounded merely in pragmatic concerns about ripeness. The *Bowe* court recognized more fundamental obstacles: "Amendment 48 puts initiative legislation upon exactly the same footing as legislation by the General Court with respect to its constitutional validity. . . . The people acting by means of the initiative, like the General Court, can enact measures that violate the fundamental and supreme law of the Constitution and that consequently have no force or effect. But no court can interfere with the process of legislation, either by the General Court or by the people, before it is completed, to prevent the possible enactment of an unconstitutional measure."[14] *Id.* at 246-247.

Article 48 creates a limited exception to this rule by empowering the Attorney General to review proposed legislation to determine whether it encompasses any of the excluded matters specifically enumerated in the first four paragraphs of § 2, some of which describe measures that would violate constitutional rights of individuals, including, for example, the right of trial by jury and freedom of speech and of the press. Art. 48, The Initiative, Part II, § 2. This court has held that the courts have power to enforce the Attorney General's duty to screen out excluded matters, for otherwise the exclusions "would be futile, and the people could be harassed by measures of a kind that they had solemnly declared they would not consider." *Bowe*, 320 Mass. at 247. However, the scope of the Attorney General's review, and therefore of the court's, is limited to the excluded subjects set out in the first four paragraphs of § 2. See *id.* at 247-248 & n.4.

This court has consistently affirmed the interpretation of the "limitations on the legislative power" provision articulated in *Bowe*. See, e.g., *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 530 (2000); *Paisner* v. *Attorney Gen.*, 390 Mass. 593, 596-597 (1983); *Horton* v. *Attorney Gen.*, 269 Mass. 503, 513 (1929). See also

[14]See *Horton* v. *Attorney Gen.*, 269 Mass. 503, 514 (1929) ("There is no provision in the Constitution that a petition accompanied by a proposed bill shall not be presented to and received and considered by the General Court unless constitutional in every respect. There is nothing in art. 48 of the Amendments altering or limiting with respect to it this general constitutional practice. The judicial department of government cannot interfere with the ordinary process of legislation").

*Cohen* v. *Attorney Gen.*, 354 Mass. 384, 389 (1968) (scope of consideration confined "to questions about excluded matters under art. 48. Not now open to contention are . . . alleged violations of art. 30 of the Declaration of Rights . . ."). All of these decisions rest on the understanding that the Attorney General's duty to certify that a petition does not contain excluded matters does not encompass, as a result of the "limitations on the legislative power" provision, any general duty to certify that the proposed law would not be void as inconsistent with the Constitution.[15] We therefore reject the plaintiffs' contention that the Attorney General's certification was improper due to an alleged delegation problem contained in the proposed law.

7. *Conclusion.* Having determined that the Attorney General properly considered the factual impact of the petition and that her certification pursuant to art. 48, The Initiative, Part II, § 3, was proper, we remand the case to the county court for entry of a declaratory judgment to that effect.

*So ordered.*

---

[15]The history and text of § 2 support this conclusion. The "limitations on the legislative power" provision originally appeared not in the "Excluded Matters" section but in a different section of art. 48 entitled "Laws," immediately after a provision stipulating that a petition approved by a majority of voters would become law. 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 675, 676, 910, 911 (1918). It was moved to the "Excluded Matters" section by the Committee on Form and Phraseology, *id.* at 952, 953, which explained that its edits made no change in the meaning of art. 48. *Id.* at 959 (Mr. Loring).

With respect to the text, unlike the first four paragraphs in § 2, the "limitations on the legislative power" provision makes no reference to whether a matter may or may not "be proposed by" or "be the subject of" an initiative petition. Finally, if we were to interpret the clause as imposing on the Attorney General a duty to screen petitions for any unconstitutionality, we would render superfluous the third paragraph of § 2, which enumerates specific constitutional rights with which the Attorney General must ensure consistency. See *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998), quoting 2A N. Singer, Sutherland Statutory Construction § 46.06 (5th ed. 1992) ("a statute must be construed 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous' ").