NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12422

CHRISTOPHER ANDERSON & others[1] vs. ATTORNEY GENERAL & others.[2]

Suffolk.      February 6, 2018. - June 18, 2018.

Present: Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.

Initiative. Constitutional Law, Initiative petition, Taxation,
     Income tax. Attorney General. Taxation, Income tax.

     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on October 3, 2017.

     The case was reported by Gants, C.J.

     Kevin P. Martin (David J. Zimmer & Joshua J. Bone also
present) for the plaintiffs.
     Kate R. Cook (Lisa C. Goodheart also present) for the
interveners.
     Juliana deHaan Rice, Assistant Attorney General (Daniel J.
Hammond, Assistant Attorney General, also present) for the
defendants.

---

     [1] Christopher Carlozzi, Richard Lord, Eileen McAnneny, and
Daniel O'Connell.

     [2] Secretary of the Commonwealth; and Angel M. Cosme, Rebecca
A. Cusick, Jose A. Encarnacion, Deborah L. Frontierro, Rebekah
L. Gewirtz, Arnold Hiatt, Mary Clare Higgins, Marven-Rhode
Hyppolite, Barbara Ann Mann, Kirsis Rafaela Nina, Kimberly
Selwitz, and Mary Ann Stewart, interveners.

The following submitted briefs for amici curiae:

Francis X. Wright, Jr., City Solicitor of Somerville, David P. Shapiro, Assistant City Solicitor of Somerville, Charles D Boddy, Jr., City Attorney of Lawrence, George Markopoulos, Assistant City Solicitor of Lynn, Mark Rumley, City Solicitor of Medford, Mikaela A. McDermott, City Solicitor of New Bedford, & Alan Seewald, City Solicitor of Northampton, for mayor of Somerville & others.

Joseph E. Sandler & Dara Lindenbaum, of the District of Columbia, Ben T. Clements, & Jessica Dormitzer for Ballot Initiative Strategy Center.

Thomas O. Bean for Alliance for Business Leadership.

Andrea C. Kramer for Center on Budget and Policy Priorities & another.

John Pagliaro & Martin J. Newhouse for New England Legal Foundation.

Mark G. Matuschak, Robert K. Smith, & Colleen McCullough for Pioneer Institute, Inc., & another.

Steven P. Lehotsky, Dan Himmelfarb, & John T. Lewis, of the District of Columbia, for Chamber of Commerce of the United States of America.

Richard Juang for Adela Gonzalez & others.


GAZIANO, J.   The Attorney General certified as suitable for printing on the 2018 Statewide ballot an initiative petition that would ask voters in the Commonwealth to decide whether to amend the existing flat tax rate mandated by the Massachusetts Constitution in order to impose a graduated tax on residents with incomes in excess of $1 million.  The language of Initiative Petition 15-17 also provides that, "subject to appropriation" by the Legislature, all revenues received from the proposed tax "shall" be earmarked for two budgetary purposes:  education and transportation.

The plaintiffs, registered voters in the Commonwealth, seek to exclude the petition from the ballot on the ground, inter

alia, that it does not meet the related subjects requirement of art. 48 of the Amendments to the Massachusetts Constitution. In addition, the plaintiffs contend that the petition would constitute a "specific appropriation of money from the treasury of the commonwealth," contrary to the explicit prohibition in art. 48, The Initiative, II, § 2, of the Amendments to the Massachusetts Constitution against such appropriations, and that the drafters of art. 48, at the Constitutional Convention of 1917-1918, did not intend that tax rates be set by initiative petitions.[3] The plaintiffs filed a complaint in the county court challenging the Attorney General's certification of the initiative petition and seeking to enjoin the Secretary of the Commonwealth (Secretary) from placing the petition on the 2018 Statewide ballot. The single justice reserved and reported the case for consideration by the full court.

We conclude that the initiative petition should not have been certified by the Attorney General as "in proper form for submission to the people," because, contrary to the certification, the petition does not contain only subjects "which are related or which are mutually dependent," pursuant to

---

[3] See Bates v. Director of the Office of Campaign & Political Fin., 436 Mass. 144, 155-156 (2002), citing D.B. Magleby, Direct Legislation: Voting on Ballot Propositions in the United States 20-25 (1984), and 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 3-16 (1918) (Constitutional Debates).

art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments.[4]

1. Background. a. Article 44. To place the issue in context, a brief description of the mandatory flat tax rate in the Massachusetts Constitution is necessary. Article 44 of the Amendments to the Massachusetts Constitution, ratified in 1915, allows the Legislature to levy a State income tax on Massachusetts residents at a "uniform rate." See Drapkin v. Commissioner of Revenue, 420 Mass. 333, 336 (1995). Article 44 provides, in relevant part:

> "Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the commonwealth upon incomes derived from the same class of property."

Pursuant to art. 44, the State income tax "must be calculated by applying a single, flat rate percentage to a particular class of

_____

[4] We acknowledge the amicus briefs of the New England Legal Foundation; the Pioneer Institute, Inc., and the Tax Foundation; and the Chamber of Commerce of the United States of America, in support of the plaintiffs. We acknowledge the amicus brief of the mayors of Somerville, Lawrence, Lynn, Medford, New Bedford, and Northampton; the amicus brief of the Ballot Initiative Strategy Center; the amicus brief of the Alliance for Business Leadership; and the amicus brief of the Center on Budget and Policy Priorities and the Institute on Taxation and Economic Policy, in support of the defendants. We also acknowledge the amicus brief of Adela Gonzalez; Zuleyka Hernandez; Ayomide Olumuyiwa, Greenroots, Inc.; and Alternatives for Community & Environment, Inc.

income."  Peterson v. Commissioner of Revenue, 441 Mass. 420, 427 (2004).  As a result of this provision, therefore, the Legislature is precluded from imposing a graduated income tax on Massachusetts taxpayers.  See Opinion of the Justices, 383 Mass. 940, 941-942 (1981); Opinion of the Justices, 266 Mass. 583, 588 (1929).

Over the past fifty years, a number of initiative petitions seeking to amend art. 44, in order to permit a graduated income tax, have been certified and presented to the voters.  In 1962, 1968, 1972, and 1976, proposals to amend the flat tax rate were placed on the ballot by the Legislature; in 1994, the ballot initiative seeking to amend the flat tax was the product of a voter-initiated petition.  In all five of these measures, the graduated income tax, alone, was the sole subject of the ballot question.  In 1994, for example, the ballot question stated:

> "This proposed constitutional amendment would require Massachusetts income tax rates to be graduated, in order to distribute the burden of the tax fairly and equitably.  The proposed amendment would require the rates for taxpayers in higher income brackets to be higher than the rates for taxpayers in lower income brackets.  The proposed amendment would also allow the state Legislature to grant reasonable exemptions and abatements and establish the number and range of tax brackets.  The proposed amendment would eliminate from the Massachusetts Constitution the present requirement that income taxes must be levied at a uniform rate throughout the state upon incomes derived from the same class of property."

Voters rejected this petition by a margin of sixty-five to twenty-eight per cent of votes cast.  On the same ballot, voters

also rejected, by a margin of sixty-five to twenty-seven per cent of votes cast, an initiative petition that a statute be enacted requiring graduated income tax rates.

b. Initiative Petition 15-17. By August 5, 2015, at least ten registered voters had filed with the Attorney General the initiative petition at issue here, entitled, "An Initiative Petition for An Amendment to the Constitution of the Commonwealth to Provide Resources for Education and Transportation through an additional tax on Incomes in excess of One Million Dollars." The petition would amend art. 44 by adding the following:

> "To provide the resources for quality public education and affordable public colleges and universities, and for the repair and maintenance of roads, bridges and public transportation, all revenues received in accordance with this paragraph shall be expended, subject to appropriation, only for these purposes. In addition to the taxes on income otherwise authorized under this Article, there shall be an additional tax of 4 percent on that portion of annual taxable income in excess of $1,000,000 (one million dollars) reported on any return related to those taxes. To ensure that this additional tax continues to apply only to the commonwealth's highest income residents, this $1,000,000 (one million dollar) income level shall be adjusted annually to reflect any increases in the cost of living by the same method used for federal income tax brackets. This paragraph shall apply to all tax years beginning on or after January 1, 2019."

On September 2, 2015, the Attorney General certified to the Secretary that the petition "is in proper form for submission to the people; that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been

qualified for submission to the people at either of the two preceding biennial state elections; and that it contains only subjects that are related or are mutually dependent and which are not excluded from the initiative process pursuant to Article 48, the Initiative, Part II, Section 2."

After the Attorney General's certification, the proponents of the initiative petition gathered and submitted sufficient additional signatures to the Secretary so that the Secretary transmitted the measure to the Legislature.  See art. 48, The Initiative, II, §§ 1, 3, 4, as amended by art. 74.  On May 18, 2016, more than one-quarter of the members of both houses of the Legislature voted in favor of the proposed constitutional amendment, and it was referred to the next legislative session. See art. 48, The Initiative, IV, § 4.  On June 14, 2017, more than one-quarter of the members of both houses again voted to approve the proposed amendment.  This litigation followed.

On October 3, 2017, the plaintiffs filed a complaint in the county court seeking a declaration pursuant to G. L. c. 214, § 1, that the initiative petition does not comply with the requirements of art. 48; they also sought an order quashing the Attorney General's certification and an injunction preventing the Secretary from placing the initiative petition on the general election ballot to be put before the voters in November, 2018.  Ten registered voters who support the petition

were allowed to intervene in the case.  The single justice then reserved and reported the matter for decision by the full court.

The plaintiffs contend that the Attorney General's certification of the petition was improper for three reasons. First, they argue that the petition combines "three very different subject matters:  whether to impose a graduated income tax, and whether to give preferential treatment in state spending to two unrelated subject matters -- education and transportation," contrary to the requirement of art. 48, The Initiative, II, § 3, as amended by art. 74, that an initiative petition address only related or mutually dependent subjects. Second, the plaintiffs maintain that the earmarking of the tax revenues that would be raised by the new tax would violate the prohibition of art. 48 against imposing "specific appropriation[s]" by initiative petitions.  See art. 48, The Initiative, II, § 2.  Third, the plaintiffs assert that an initiative petition may not be used to usurp the Legislature's authority to tax, and that a petition to modify the Massachusetts Constitution is on a different footing in this regard from a petition to create a statute.

2.  Standard of review.  A challenge to the Attorney General's decision to certify an initiative petition is reviewed de novo.  See Abdow v. Attorney Gen., 468 Mass. 478, 487 (2014). In reviewing a challenge to an initiative petition proposed by

at least ten registered voters in the Commonwealth, we construe art. 48 in a manner "mindful that art. 48 establishes a 'people's process,'" Bates v. Director of the Office of Campaign & Political Fin., 436 Mass. 144, 154 (2002), quoting Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 199 (1976), that "gives the people of Massachusetts the opportunity 'to enact statutes regardless of legislative opposition'" and to "move forward on measures which they deem[] necessary and desirable," regardless of legislative opposition. Bates, supra, quoting Citizens for a Competitive Mass. v. Secretary of the Commonwealth, 413 Mass. 25, 30 (1992). See Carney v. Attorney Gen., 451 Mass. 803, 814 (2008).

At the same time, however, we are obligated to safeguard the integrity of the initiative petition process by requiring that those seeking to change the law strictly comply with art. 48. "[T]he provisions of art. 48 are mandatory rather than directory. . . . [W]hen [the people] . . . seek to enact laws by direct popular vote they must do so in strict compliance with those provisions and conditions" (citations omitted). Opinion of the Justices, 422 Mass. 1212, 1219 (1996). See Hurst v. State Ballot Law Comm'n, 427 Mass. 825, 828 (1998) ("The State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy. The proper form and use of petitions is an important

aspect of the balance art. 48 represents, and our review must respect that balance").

3. <u>Discussion</u>. The plaintiffs challenge the Attorney General's certification that Initiative Petition 15-17 contains only subjects "which are related or which are mutually dependent." Art. 48, The Initiative, II, § 3, as amended by art. 74.

a. <u>Related subjects requirement</u>. In deciding whether an initiative petition contains subjects "which are related or which are mutually dependent," we examine whether "the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters[.] That is the crux of the relatedness controversy." <u>Carney</u> v. <u>Attorney Gen</u>., 447 Mass. 218, 226 (2006) (<u>Carney I</u>). The mandate that an initiative petition contain a single "common purpose" arises because a voter, unlike a legislator, "has no opportunity to modify, amend, or negotiate the sections of a law proposed by popular imitative." <u>Id</u>. at 230, 231. A voter cannot "sever the unobjectionable from the objectionable," and must vote to approve or reject an initiative petition in its entirety. <u>Id</u>. at 230. Accordingly, to avoid "abuse" of the process and confusion among voters, while an initiative petition may contain numerous subjects, it must embody one purpose, and "must express

an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy."  Id. at 230-231.

The language of art. 48 emerged from the Constitutional Convention of 1917-1918, "from which we may discern the conditions under which art. 48 came into existence, and how it appears then to have been received and understood by the convention, and ultimately, by the voters" (citation and quotations omitted).  Carney I, 447 Mass. at 226.  The requirement of art. 48 that an initiative petition must "contain[] only subjects . . . which are related or which are mutually dependent" was intended to balance the "interests of initiative petitioners and the interests of those who would ultimately vote on the petition."  Abdow, 468 Mass. at 499.

The convention adopted the related subjects requirement in response to two concerns raised by the delegates:  the potential for voter confusion and "the dangers of 'log-rolling,'"[5] which had given rise to harms in other States.  Dunn v. Attorney Gen., 474 Mass. 675, 679-680 (2016).  See Carney I, 447 Mass. at 226-

---

[5] "Logrolling" is the "practice of including several propositions in one measure or proposed constitutional amendment so that the . . . voters will pass all of them, even though these propositions might not have passed if they had been submitted separately."  Dunn v. Attorney Gen., 474 Mass. 675, 679 (2016), quoting Carney v. Attorney Gen., 447 Mass. 218, 219 n.4 (2006) (Carney I).

227. Otherwise put, the relatedness requirements were intended to protect against petitions which include "as alluring a combination of what is popular with what is desired by selfish interests as the proposers of the measures may choose." Carney I, supra at 227, quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 12 (1918) (Constitutional Debates). See Dunn, supra; Hensley v. Attorney General, 474 Mass. 651, 652, 658 (2016); Gray v. Attorney General, 474 Mass. 638, 644-647 (2016); Abdow, 468 Mass. at 498-499.

The relatedness requirement was imposed in its current form, mandating that initiative petitions contain only subjects that are "related" or "mutually dependent," after much debate among the delegates about how best to avoid "packaging proposed laws in a way that would confuse the voter," Carney I, 447 Mass. at 228, or otherwise be "misleading." See id. at 225, 227-230 & n.21.[6] "To prevent initiative petitions from being exploited in

---

[6] As an example of impermissible log-rolling, the delegates to the convention debated a provision placed before voters in Oregon through an initiative process:

"But, sir, you now invite the self-seekers who cannot get their legislation through the General Court to turn to the people whom they may wheedle or deceive into granting the privileges that our representatives never would permit. I have time to refer but incidentally to the measures that become law through the blind wording of titles or to catchy provisions, as illustrated by a case in Oregon, where, in order to secure the passage of the single tax, there was

this manner, the delegates considered potential limitations on their subject matter. . . .   One delegate offered an amendment to require that '[n]o proposed law shall contain more than one subject,' which another delegate proposed modifying to state that a proposed law 'shall not contain unrelated subjects.' . . .   This modified amendment was adopted by the convention, and, after some reworking by the committee on form and phraseology, ultimately was approved as the provision in art. 48 . . . , requiring the Attorney General to certify that a proposed measure 'contains only subjects . . . which are related or which are mutually dependent.'"  Dunn, 474 Mass. at 679-680, citing Carney I, 447 Mass. at 227-228; Constitutional Debates, supra at 12, 537, 567, 701-702.

We were first called upon to construe the "related subjects requirement" in 1941, in a petition involving education about birth control for married couples.  See Opinion of the Justices, 309 Mass. 555, 560-561 (1941).  In that case, we determined that the requirement that initiative petitions contain "only

hitched to the front of it, like a locomotive to the front of a freight train, a proposal that there should be no more poll or head taxes.  The important part of them had been abolished for years, but nevertheless that proposal hauled the heavy freight through and put into the Constitution of Oregon the single-tax proposition that the people had previously rejected."

Carney I, 447 Mass. at 227 n.20, quoting Constitutional Debates, supra at 567.

subjects . . . which are related or which are mutually dependent" was met because "[t]he particular subjects of the proposed law appear[ed] to be germane to the general subject of prevention of pregnancy or conception, to such an extent, at least, that they [could not] rightly be said to be unrelated." Id. at 561.

Forty years later, we relied on that test in Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 221 (1981), quoting Opinion of the Justices, 309 Mass. at 561, in discussing the related subjects requirement of art. 48, The Initiative, II, § 3, as amended by § 74, where we concluded that the requirement that an initiative petition contain "only subjects . . . which are related or which are mutually dependent," would be satisfied if "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." Massachusetts Teachers Ass'n, supra at 219-220. We cautioned, however, that while "[i]t is not for the courts to say that logically and consistently other matters might have been included or that particular subjects might have been dealt with differently," "the general subject of an initiative petition cannot be so broad as to render the 'related subjects'" limitation meaningless. Id., citing Opinion of the Justices, supra. In 1996, in considering whether an initiative petition met the

requirement of "relatedness," defined as whether it violated "the art. 48 requirement that all subjects of an initiative be related or mutually dependent," the Justices again relied upon the test in Massachusetts Teachers Ass'n, supra, whether "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." Opinion of the Justices, 422 Mass. at 1220.

Ten years later, in Carney I, 447 Mass. at 220, 226, 228, we examined the history of the constitutional debates on the "relatedness limitation," as it was enacted in its final form, requiring that an initiative petition "contain[] only subjects . . . which are related or which are mutually dependent," and held that "[t]he plain wording of art. 48 and the context in which it was enacted demonstrate that the relatedness limitation is one of many restrictions on the popular initiative process intended to avoid confusion at the polls and to permit citizens to exercise a meaningful choice when voting to accept or reject a proposed law."

In our subsequent decisions, we have continued to follow what has been known as the "related subjects" requirement or the "relatedness requirement."  In Dunn, 474 Mass. at 679-680, we analyzed the "related subjects requirement," which we defined as the requirement of art. 48 that "a proposed measure 'contain[ ] only subjects . .  which are related or which are mutually

dependent," in terms of whether the two distinct provisions in the petition shared a "common purpose" as defined in Carney I, 447 Mass. at 226. In Hensley, we determined that an initiative petition "easily satisfie[d] the related subjects requirement of art. 48" because, first, its provisions met the requirements that their "similarities . . . dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters." Hensley, 474 Mass. at 658, quoting Carney I, supra. Second, the multiple provisions in the petition expressed "an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy." Hensley, 474 Mass. at 658, quoting Abdow, 468 Mass. at 501. We concluded that the petition met the relatedness requirement of art. 48 because it "[laid] out a detailed plan to legalize marijuana . . . for adult use" and to create a system that would license, regulate, and tax retail sales. Hensley, supra.

Similarly, in Gray, 474 Mass. at 644-649, in considering the "related subjects requirement," we determined that the subjects of the petition were not mutually dependent because they could "exist independently," and then decided the matter relying on the "relatedness limitation" as defined in Carney I, 447 Mass. at 226, and concluded that the subjects had no "common

purpose."  In Abdow, 468 Mass. at 498-499, we concluded that the "proposed measure" did not violate the "so-called 'relatedness' or 'related subjects' requirement of art. 48, which states that an initiative petition must 'contain[] only subjects . . . which are related or which are mutually dependent."  We determined that the petition contained "a significant 'common purpose,'" and its provisions were "not so loosely tied together as to render the related subjects requirement meaningless, and [were] operationally related in a way that would 'permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy.'"  Id. at 501.  See Albano v. Attorney General, 437 Mass. 156, 161 (2002) (discussing "the relatedness requirement" as whether "a petition contains only subjects 'which are related or which are mutually dependent'" and deciding that "entire petition" [with several distinctly separate provisions] shared "[a] common purpose" that was not "so broad as to render the 'related subjects' limitation meaningless" [citations omitted]); Mazzone v. Attorney Gen., 432 Mass. 515, 529 (2000) (under subheading "[r]elated or mutually dependent subjects," discussing and determining that subjects of petition were "related to a single, common purpose" of expanding scope of drug treatment and drug abuse prevention programs).

As mentioned, in Gray, 474 Mass. at 648, one of the few occasions in which we have concluded that a petition did not

meet the related subjects requirement, we did discuss briefly, under the subheading of "[r]elatedness," whether two subjects were mutually dependent, and concluded that they were not.  In a lengthy discussion under the same subheading, we also considered "the core of the related subjects requirement," that is, whether the "initiative petition's provisions share a 'common purpose,' . . . put slightly differently but making the same point, . . . a 'unified statement of public policy' that the voters can accept or reject as a whole" (footnote omitted).  Id. at 645-646, quoting Massachusetts Teachers Ass'n, 384 Mass. at 219-220, and Carney I, 447 Mass. at 231.  Since then, other than in quoting the language of art. 48, we have not had cause to address separately whether the subjects of a petition are "mutually independent."  See Gray, supra at 644-649.

As these cases demonstrate, the language "or which are mutually dependent" in the relatedness requirement does not lessen the limitation that an initiative petition under art. 48, The Initiative, II, § 3, as amended by art. 74, must contain a single common purpose and express a unified public policy.  Nor does it impose a separate requirement that may be satisfied even if the subjects of a petition are not related.  The questions whether "the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the

voters," and whether two or more provisions in an initiative petition "express an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy," are two sides of the same coin.  See Carney I, 447 Mass. at 226, 230-231.  See also Dunn, 474 Mass. at 680; Massachusetts Teachers Ass'n, 384 Mass. at 219.

"A constitutional amendment should be 'interpreted in the light of the conditions under which it . . . [was] framed, the ends which it was designed to accomplish, the benefits which it was expected to confer and the evils which it was hoped to remedy.'"  Mazzone, 432 Mass. at 526, quoting Tax Comm'r v. Putnam, 227 Mass. 522, 524 (1917).  "'Its words are to be given their natural and obvious sense according to common and approved usage at the time of its adoption,' although the historical context should not 'control[] the plain meaning of the language.'"  Mazzone, supra, quoting General Outdoor Advertising Co. v. Department of Pub. Works, 289 Mass. 149, 158 (1935).

In its dictionary definition, "mutual" means "directed by each toward the other or others; reciprocal."  Black's Law Dictionary 1178 (10th ed. 2014).  In common usage, "mutual" is defined as "having the same relation each toward the other" and "of or pertaining to each of two or more; held in common; shared."  Webster's New Universal Unabridged Dictionary 1270

(2003). A "dependent" is defined as "[s]omeone who relies on another for support; one not able to exist or sustain oneself without the power or aid of someone else," and "dependence" is defined as "[a] relationship between two . . . things whereby one is sustained by the other or relies on the other for support or necessities." Black's Law Dictionary, supra at 531. In common usage, "dependent" also means "conditioned or determined by something else"; "contingent"; and "not used in isolation; used only in connection with other forms." Webster's New Universal Unabridged Dictionary, supra at 534.

While the word "or" is often used as a disjunctive, it also has a number of other meanings. The word "or" may be "used to correct or rephrase what was previously said." Webster's New Universal Unabridged Dictionary, supra at 1360. It is fundamental to statutory construction that the word "or" is disjunctive "unless the context and the main purpose of all the words demand otherwise."[7] Eastern Mass. St. Ry. v. Massachusetts

---

[7] In Gaynor's Case, 217 Mass. 86, 89-90 (1914), the court observed:

> "It is argued that 'or' in the clause quoted from [St. 1911, c. 751,] Part V, § 2, should be construed to mean 'to wit,' or identity with or explanation of that which goes before. Sometimes it is necessary to attribute this signification to the word in order to effectuate the plain legislative purpose. Commonwealth v. Grey, [2 Gray 501 (1854)]. Brown v. Commonwealth, 8 Mass. 59 [(1811)]. It often is construed as 'and' in order to accomplish the intent manifested by the entire act or instrument in which

Bay Transp. Auth., 350 Mass. 340, 343 (1966), citing Commonwealth v. Keenan, 139 Mass. 193, 194 (1885). See, e.g., Miller v. Miller, 448 Mass. 320, 329 (2007) (same); Bleich v. Maimonides Sch., 447 Mass. 38, 46-47 (2006) (same); Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgt. Bd., 421 Mass. 196, 212 (1995) (same). "Although the disjunctive 'or' may suggest separate meanings for the two terms . . . , it does not require mutual exclusivity. The word 'or' commonly introduces a synonym or 'definitional equivalent.'" McCarthan v. Director of Goodwill Indus. Suncoast, Inc., 851 F.3d 1076, 1087 (2017), quoting A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 122 (2012). See 1A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 21.14 (7th ed. 2009). See also United States v. Harris, 838 F.3d 98, 105 (2d Cir. 2016), cert. denied, 137 S. Ct. 840, (2017), quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In any event, even when striving to ensure separate meanings, the

---

it occurs. . . . It is not synonymous with 'and' and is to be treated as interchangeable with it only when the obvious sense requires it, or when otherwise the meaning is dubious. But the word 'or' in its ordinary use and also in accurate meaning is a disjunctive particle. It marks an alternative and not a conjunctive. It indicates one or the other of two or several persons, things or situations and not a combination of them. . . . It is construed as having a different meaning only when the context and the main purpose to be accomplished by all the words used seems to demand it."

disjunctive canon does not apply absolutely, particularly where 'the context dictates otherwise'").

In other words, while operationally related subjects need not be mutually dependent, "we need not pause to consider whether any subjects which are mutually dependent could ever be said not also to be related." Massachusetts Teachers Ass'n, 384 Mass. at 218 n.8. As discussed, the provision the delegates referred to as the "unrelated matters" provision, Constitutional Debates, supra at 960, was approved by the delegates, under that designation, when it comprised the phrase "shall not contain unrelated subjects." Id. at 856. The provision was adopted after much debate by the delegates on how to prevent particular misuses of the initiative process, and whether initiative petitions should be limited to a single subject. Id. at 12, 537, 567, 701-702. The words "or which are mutually dependent" were added at the last moment, when the "related subjects" language was "referred back" to the committee on form and phraseology. Constitutional Debates at 953. The committee "on its own initiative, moved the relatedness limitation from its 'isolated' position and incorporated it into the section of the final draft initiative amendment concerning the Attorney General's certification duties" that the committee reported back to the delegates. See Carney I, 447 Mass. at 228, citing Constitutional Debates, supra at 1051. These changes were

described by the delegates themselves as "unimportant" and as not affecting the meaning of the provision. Constitutional Debates, supra at 773, 911, 959-960. The delegates then adopted the final language without further debate. Id. at 1050-1051. Thus, the words "or which are mutually dependent" were added as a means of assisting, first, the Attorney General and, thereafter, the court, in language that was then well understood, to examine a petition to determine if its core purpose "dominate[s] what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters." Carney I, supra at 226. See Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 81 (1917); County of Berkshire v. Cande, 222 Mass. 87, 90-91 (1915); Edwards v. Bruorton, 184 Mass. 529, 530-531 (1904); Nolan's Case, 122 Mass. 330, 332-333 (1877); Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99 (1854).

To construe the phrase "or which are mutually dependent" as eliminating the requirement of relatedness would be to vitiate the purpose of protecting the voters from misuse of the petitioning process for which it was enacted. "An amendment to the Constitution is one of the most solemn and important of instruments. . . . Its words should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption,' because it is proposed for public adoption and must

be understood by all entitled to vote." Carney I, 447 Mass. at 224, quoting Opinion of the Justices, 324 Mass. 746, 749 (1949). "We reject any restrictive reading of art. 48, as amended, that results in a failure to give effect to the purpose for which its words were chosen." Carney I, supra at 225, quoting Hurst v. State Ballot Law Comm'n, 427 Mass. 825, 828 (1998). This is no doubt why, since its introduction, our jurisprudence construing art. 48, The Initiative, II, § 3, as amended by art. 74, has focused largely, or almost exclusively, on the question of "relatedness," rather than on "mutual dependence."

b. Application. With this guidance in mind, we turn to the petition at issue. Initiative Petition 15-17 contains three provisions on three distinct subjects presented as a single ballot question. First, the petition would amend the flat tax rate mandated by art. 44 to impose a graduated income tax on certain high-income taxpayers. Second, the petition would prioritize spending for public education by earmarking revenues raised by the new tax for "quality public education and affordable public colleges and universities." Third, the petition would prioritize spending for transportation by earmarking revenues raised by the new tax for "the repair and maintenance of roads, bridges and public transportation."

The parties understandably do not raise any arguments specifically concerning whether the provisions of the petition are mutually dependent. It is immediately apparent, however, that the three provisions are not mutually dependent. As discussed, petitions seeking to impose a graduated tax rate or a tax on specific high-income earners previously have been presented to the voters of the Commonwealth as stand-alone initiatives. It is also evident that funds for "quality public education" and "affordable public colleges and universities" could be raised and provided to educational institutions separately from any expenditures on transportation, and that raising funds for "repair and maintenance of roads, bridges and public transportation" could proceed without any expenditures on education, at any grade level. Indeed, the dissent states as much when it notes that a differently worded petition, directing one-half of the funds raised to transportation and the other one-half to education, would remove from the Legislature "the latitude accorded it by the original proposed law to spend on the two identified areas as it saw fit, and instead would be limited to spending the funds raised specifically for each area regardless of the particular needs in each area." Post at . Because the provisions here can "exist independently," they are not "mutually dependent," just as in Gray, 474 Mass. at 648, where the diagnostic assessment tests and the reporting of the

prior year's test results were not "mutually dependent" because they could "exist independently."[8]

---

[8] Even if we were to accept the argument that the proposed spending provisions are dependent upon a particular funding mechanism -- the proposed tax  -- that would not change the evident fact that the proposed tax can stand on its own, and neither spending provision depends upon the other.  Moreover, that the two funding provisions rely on a particular source of funds does not make the provisions "mutually dependent."  At the time of the Constitutional Debates of 1917-1918, it was well established that the source of funds for a desired public expenditure could be severed from the purpose of the expenditure, and that the two were not mutually dependent.  See Edwards v. Bruorton, 184 Mass. 529, 530-532 (1904), citing Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99, 100 (1854), and compiling cases ("In statutes providing for the expenditure of money for the benefit of the public, containing an unconstitutional provision for raising money by taxation, it has been held in different jurisdictions that the invalid part may be disregarded and the substantial part enforced, leaving payment to be provided for in a constitutional way").

By the same token, in Mazzone v. Attorney General, 432 Mass. 515, 517 (2000), we considered a petition proposing an "[a]ct to expand the scope of the commonwealth's drug treatment program and provide funding through fines for drug violations and the forfeiture of assets used in connection with drug offenses."  We concluded that the distinct taxing and funding provisions of the petition were "related to a single, common purpose.  All provisions of the petition relate directly or indirectly to expanding the scope of the Commonwealth's drug treatment programs and, as the Attorney General aptly describes it, 'fairly' funding those programs.  To that end, the various provisions of the petition expand the class of individuals entitled to diversion into the Commonwealth's drug treatment programs, provide a source of funds, 'fairly' obtained, for those programs, and direct the development of drug abuse prevention programs."  Id. at 529. Accordingly, because the "fines" and "other proceeds" to be raised and the drug rehabilitation programs to be funded served the single common purpose of expanding access to drug treatment programs, the petition met the "relatedness" requirement of art. 48.  See id. at 524, 529.

Although she certified the subjects as sufficiently related, the Attorney General has not articulated a common purpose between these spending priorities, beyond the abstract determination that both purposes are "broad areas of public concern." The interveners, for their part, assert that prioritizing spending for education and transportation will "strengthen[] the Massachusetts economy and set[] a foundation for inclusive growth." Some of the amici characterize the petition as intended "for economic advancement and social mobility" of specific groups within the Commonwealth. The difficulty the proponents have in stating the purported purpose of the initiative petition is itself telling.

As a general matter, we agree with the Attorney General's observation that the subjects of education and transportation are areas of broad public concern, and efforts to improve them may be characterized as socially beneficial and for the common good. We also agree that education and transportation are among the many keys to "inclusive growth." Nonetheless, as we emphasized in Gray, 474 Mass. at 648, the related subjects requirement is not satisfied by the ability to articulate a "conceptual or abstract bond" between diverse subjects, such as "broad areas of public concern" and "keys to inclusive growth." See Carney I, 447 Mass. at 230 ("It is not enough that the provisions in an initiative petition all 'relate' to some same

broad topic at some conceivable level of abstraction"). See, e.g., id. at 226, citing Opinion of the Justices, 422 Mass. at 1220 (parties disputed whether common purpose of initiative petition was characterized broadly as "to make Massachusetts government more accountable to the people" or more narrowly as "legislative accountability"). As we have cautioned, a common purpose cannot be so overbroad as to "render the 'related subjects' limitation meaningless." Massachusetts Teachers Ass'n, 384 Mass. at 219.

There is "no single 'bright-line' test for determining whether an initiative meets the related subjects requirement." See, e.g., Dunn, 474 Mass. at 680; Hensley, 474 Mass. at 657; Abdow, 468 Mass. at 500; Carney I, 447 Mass. at 226. "On the one hand, the requirement must not be construed so narrowly as to frustrate the ability of voters to use the popular initiative as 'the people's process' to bring important matters of concern directly to the electorate; the delegates to the constitutional convention that approved art. 48 did, after all, permit more than one subject to be included in a petition, and we ought not be so restrictive in the definition of relatedness that we effectively eliminate that possibility and confine each petition to a single subject." Abdow, supra at 499, citing Massachusetts Teachers Ass'n, 384 Mass. at 219-229 and nn.9, 10. "On the other hand, relatedness cannot be defined so broadly that it

allows the inclusion in a single petition of two or more subjects that have only a marginal relationship to one another, which might confuse or mislead voters, or which could place them in the untenable position of casting a single vote on two or more dissimilar subjects." Abdow, supra, citing generally Carney I, supra at 224-232.

In Gray, 474 Mass. at 640-643, for example, the Attorney General certified an initiative petition which purported to address related subjects in the area of educational reform. The petition sought to end the use of "Common Core" educational standards, and also would have required the annual release of the prior year's comprehensive assessment tests. Id. at 640-643. Finding "the twin educational facets of curriculum and assessment . . . inextricably coupled," the Attorney General determined that the provisions were "operationally related" to serve a "common purpose of imposing 'new procedural requirements on the development and implementation of educational standards.'" Id. at 648. In considering whether the questions were sufficiently related for purposes of art. 48, we noted that the two subjects of curriculum content and comprehensive assessments -- which test knowledge of the curriculum -- were connected at a "conceptual level." Id. Aside from this theoretical connection, however, we concluded that the two provisions addressed separate public policy issues: the

elimination of Common Core curriculum standards and the publication of assessment tests.  We determined that it would be unfair to place voters in the untenable position of casting a single vote on two dissimilar subjects, which each happened broadly to pertain to aspects of educational reform.

Similarly, in Carney I, 447 Mass. at 224, 232, we rejected the Attorney General's certification of two unrelated subjects that had been grouped together and designated as a provision to promote "the more humane treatment of dogs."  The initiative petition in that case, entitled "An Act to protect dogs," proposed to expand criminal sanctions against those who abuse dogs, and to dismantle the dog racing industry.  Id. at 219-222.  We concluded that the provisions did not "express an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy."  Id. at 230-231.  As for the likely impact of that initiative petition at the polls, we observed, "The voter who favors increasing criminal penalties for animal abuse should be permitted to register that clear preference without also being required to favor eliminating parimutuel dog racing.  Conversely, the voter who thinks that the criminal penalties for animal abuse statutes are strong enough should not be required to vote in favor of extending the reach of our criminal laws because he favors abolishing

parimutuel dog racing." Id. at 231. Likewise, in Opinion of the Justices, 422 Mass. at 1220-1221, we concluded that the stated common purpose of "legislative accountability" was insufficient to bind together disparate provisions in a petition that was designed to address compensation for legislators and the inspection of records kept by the commissioner of veterans' services.

By contrast, in Dunn, 474 Mass. at 676, 682, we concluded that an initiative petition prohibiting (1) the confinement of egg-laying hens, calves raised for veal, and breeding pigs on a farm "in a cruel manner," and (2) the sale of eggs or meat produced from animals so confined contained matters that were sufficiently related to satisfy art. 48. The opponents of the initiative petition in that case maintained that the Attorney General's certification of the petition was improper because the farm provisions and the sales provisions addressed different public policies. Id. at 681. They argued that it would be unfair to ask voters to choose between banning certain farming methods and requiring retailers to alter their purchasing decisions. Id. We determined that "[b]oth the farm provision and the sales provision share a common purpose of preventing farm animals from being caged in cramped conditions." Id. Moreover, the two provisions complemented each other "in the means of accomplishing this common purpose." Id.

Examination of the diverse subjects of Initiative Petition 15-17, by contrast, discloses no "operational relatedness among its substantive parts" (citation omitted), Dunn, 474 Mass. at 680, and we are unable to discern a common purpose or unified public policy that the voters fairly could vote up or down as a whole. The two subjects of the earmarked funding themselves are not related beyond the broadest conceptual level of public good. In addition, they are entirely separate from the subject of a stepped rather than a flat-rate income tax, which, by itself, has been the subject of five prior initiative petitions. Because a reasonable voter could not fairly accept or reject the petition as a unified statement of public policy, Initiative Petition 15-17 does not meet the relatedness requirement set forth in art. 48, The Initiative, II, § 3, as amended by art. 74.[9] Including it on the ballot would place a reasonable voter in the "untenable position of

_____

[9] Given the result we reach, we need not address the plaintiffs' argument that the petition violates the provision in art. 48, The Initiative, II, § 2, that "[n]o measure . . . that makes a specific appropriation of money from the treasury of the commonwealth . . . shall be proposed by an initiative petition." See Associated Indus. of Mass. v. Secretary of the Commonwealth, 413 Mass. 1, 6-8 (1992) (prohibition on initiative petition that "removes public monies, and the decision how to spend them, from the control of the Legislature" is not violated where language of petition concerned raising of public revenues and petition included provision that such funds were designated for specific purposes "subject to" appropriation by Legislature). For similar reasons, we do not address the claim that the delegates to the Constitutional Convention of 1917-1918 did not intend that tax rates be set by initiative petition.

casting a single vote on two or more dissimilar subjects." See Abdow, 468 Mass. at 499.

The Attorney General maintains that "[t]he reasonably cognizant voter, simply by reading the text of the petition, is on alert that, if she objects to how this new revenue will be raised or spent, she should vote 'no' on the measure." This view would leave a voter who favored a graduated income tax but disfavored earmarking any funds for a specific purpose, for example, in the untenable position of choosing which issue to support and which must be disregarded. A voter who favored designating specific State funds for schools and transportation (subject to legislative appropriation), but not a graduated income tax, would be confronted with the same conundrum. A voter who commuted to work on an unreliable subway line, but who did not have school-aged children and was unconcerned about public education, might want to prioritize spending for public transportation, without devoting additional resources to public education, but would be unable to vote for that single purpose. A parent of young children, who lived in a rural part of the Commonwealth and did not own a motor vehicle, would be unable to vote in favor of prioritizing funding for early childhood education without supporting spending for transportation.[10] See

---

[10] We are not entirely unaware of the possibility that, as the plaintiffs argue, these "broad areas of public concern" were

Carney I, 447 Mass. at 231.  Placing voters in the untenable position of either supporting or rejecting two important, but diverse, spending priorities, accompanied, in either case, by a major change in tax policy, is "the specific misuse of the initiative process that the related subjects requirement was intended to avoid."  See Gray, 474 Mass. at 649.  "We are not free to temper the stringent formal limitations adopted by the people to ensure the integrity of the initiative process."  Carney I, 447 Mass. at 224-225.

In essence, the dissent raises three issues.  The dissent argues that:  (1) a taxing proposition and a funding proposition cannot be separated and are always mutually dependent; (2) if

_____

added to the initiative petition as a means to "sweeten the pot" for voters.  In discussing the differences between the prior, unsuccessful, petitions for constitutional amendments to the flat tax rate that were presented as single-issue petitions and this petition, then Senate President Stanley Rosenberg remarked, "In the past, constitutional amendments have been very differently constructed.  This one because it is focused specifically on money for education and transportation will stand a better chance of being approved.  And, also because it is very clear that it (affects) people who make more than $1 million in taxable income."  See Tuthill, Backers of Proposed Tax Hike on Massachusetts Millionaires File Signatures, WAMC Northeast Public Radio (Dec. 2, 2015), http://wamc.org/post /backers-proposed-tax-hike-massachusetts-millionaires-file- signatures [https://perma.cc/6UR3-NHP6].  Thus, the focus of legislators, like Rosenberg, was specifically on proposals to appropriate funds for education and transportation, because those proposals would stand a better chance of being approved by voters who would be forced to disregard the elimination of the flat tax in order to approve publicly beneficial funding initiatives.  This, of course, is precisely what art. 48, The Initiative, II, § 3, as amended by art. 74, seeks to prevent.

the subjects of a petition are mutually dependent, there is no concern about the possibility of misleading or confusing the voters, and thus no need for consideration whether the petition expresses a single common purpose; and (3) the decision in this case that the provisions are neither related nor mutually dependent deprives the voters of their right to express an opinion on the petition.

The gravamen of the dissent's argument is that any collection of provisions that would tax any number of different sources, and would provide funds to some indeterminate list of distinct entities and purposes, should be placed before the voters, because the list of provisions would be "mutually dependent," and therefore inseparable; in this view, removing any one of the taxing sources or funding priorities would fundamentally alter the proposed law. The problem with this is that, at the time of the 1917-1918 Constitutional Convention, this court had established that a taxing provision establishing a source of funds, and a spending provision, could be separated. See Edwards, 184 Mass. at 530-532.

In addition, in this view, there is no requirement of a common purpose or a coherent statement of public policy that the voters can accept or reject as a whole. Because the provisions are inseparable, the dissent would have it, there is no concern about logrolling, or that the voters would be confused, misled,

or placed in the untenable position of having to choose between two or more dissimilar subjects in casting a single vote. Thus, petitions that contain only "mutually dependent" provisions, as crafted by the proponents of the petitions, would be insulated from the protections that art. 48 was intended to provide. In particular, any petition containing provisions for both taxing and spending would be shielded from review by the Attorney General and, thereafter, the courts, to determine whether the proposed law presented a single statement of public policy, suitable to be placed before the voters. Taken to its logical conclusion, merely by adding to each provision a statement that the provision is intended to be part of a particular package, and cannot stand on its own, petitioners would be able to guarantee that none of their petitions were subject to any sort of meaningful review. This would leave the question of relatedness, which was so intensely debated by the delegates to the 1917-1918 Constitutional Convention, on the cutting room floor.

Lastly, the dissent argues that construing the requirement of related or mutually dependent subjects as required under art. 48, The Initiative, II, § 3, as amended by art. 74, and, therefore, concluding that the petition is not suitable to be placed on the ballot, deprives the voters of the Commonwealth of the right to "express their opinion on a one-section, four-

sentence petition." Post at    .  To the contrary, however, a decision to place before the voters three distinct policy provisions, yet permit them only to accept, or reject, all three as a package, would deprive the voters of the Commonwealth of their right "to exercise a meaningful choice when voting to accept or reject a proposed law." Carney I, 447 Mass. at 220. They would be unable to express a reasoned view on each distinct provision, independently, and on its own merits.

Moreover, while the dissent asserts that the petitioners have an absolute "right" to place before the voters "this petition," in contrast to some other law that would be proposed if any of the provisions were not included, there is no such right.  Article 48 was designed precisely to prevent any conceivable collection of provisions from being presented to the voters.  See Carney I, 447 Mass. at 220-222.  The relatedness requirement of the language in art. 48, The Initiative, II, § 3, as amended by art. 74, was intended to balance the "interests of initiative petitioners and the interests of those who would ultimately vote on the petition." Abdow, 468 Mass. at 499.  In other words, art. 48 was designed to safeguard the rights of the voters to be presented with a coherent, single statement of public policy, rather than be misled by efforts to "wheedle or deceive [them] into granting the privileges that our representatives never would permit" by presenting "measures that

become law through the . . . wording of titles or . . . catchy provisions . . . that the people had previously rejected." Carney I, 447 Mass. at 227 n.20, quoting Constitutional Debates, supra at 567. It is hard to view a proposed "constitutional amendment" that one of its proponents said was deliberately "very differently constructed" from prior similar amendments, and where "because it is focused specifically on money for education and transportation will stand a better chance of being approved," as other than the precise type of wheedling and deceiving that the delegates had in mind when they adopted the relatedness requirement. See note 10, supra.

"Neither the Attorney General nor this court is required to check common sense at the door when assessing the question of relatedness. The relatedness limitation of art. 48 must not be permitted to drift from its intent to secure to voters the right to enact a uniform statement of public policy through exercising a meaningful choice in the initiative process." Carney I, 447 Mass. at 232.

Conclusion. The matter is remanded to the county court, where a judgment shall enter declaring that the Attorney General's certification of Initiative Petition 15-17 is not in compliance with the related subjects requirement of art. 48 and the petition is not suitable to be placed on the ballot in the 2018 Statewide election.

So ordered.

LENK, J. (concurring).  I concur with the result and with much of the court's reasoning as to whether Initiative Petition 15-17 contains related subjects.  I write separately because I agree with the dissent's view that the mandate in art. 48 of the Amendments to the Massachusetts Constitution requiring that a petition contain "only subjects . . . which are related or which are mutually dependent" is disjunctive in nature; it sets out two alternatives and calls for two different analyses.  I agree, further, with the dissent that the court should consider the phrase "mutually dependent" as it would have been understood at the time of the 1917-1918 Constitutional Convention, as discussed in the court's then extant jurisprudence concerning the severability of statutory provisions.  Although this case presents squarely the question whether unrelated subjects may be mutually dependent -- they can be, if rarely -- I disagree with the dissent that Initiative Petition 15-17 contains subjects which are in fact mutually dependent.

In the years leading up to the Constitutional Convention, to decide whether statutory provisions were severable, this court would consider whether they were "mutually dependent and must stand or fall together."  See Nolan's Case, 122 Mass. 330, 333 (1877).  Where each provision of a statute could "stand independently," the provisions were not considered mutually dependent and, accordingly, were deemed severable.  See

Commonwealth v. Petranich, 183 Mass. 217, 220 (1903).  See also County of Berkshire v. Cande, 222 Mass. 87, 90-91 (1915) (statutory parts that are "wholly independent of each other" are severable).[1]

Although severability analysis concerns statutory provisions, art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments, speaks of "subjects . . . which are mutually dependent."  To determine whether Initiative Petition 15-17 satisfies this constitutional requirement, we must ask whether the subjects of Initiative Petition 15-17 can "stand independently" and, if not, whether they must instead "stand or fall together."  See Petranich, 183 Mass. at 220; Nolan's Case, 122 Mass. at 333.  That, in turn, requires us to ascertain what those subjects are.  While the number of provisions in a statute turns on how the statute is written, discerning the subjects contained therein is a question of substance.  Compare Century Dictionary and Cyclopedia 4806 (1904) (defining "provision" as "a distinct clause in an instrument or statute") with id. at

---

[1] The dissent cites Warren v. Mayor & Alderman of Charlestown, 2 Gray 84, 100 (1854), for the proposition that "'mutually dependent' subjects are those which, if separated from one another, would no longer convey the meaning or purpose of the proposition." Post at    . This, however, too broadly construes the Warren court's view of mutual dependence. Only statutory parts which were "conditions, considerations or compensations for each other" could be deemed mutually dependent. Warren, supra at 99.

6020 (defining "subject" as "[t]hat on which any mental operation is performed; that which is thought, spoken, or treated of").  See 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 567-568 (1918) (chair of committee on rules and procedure using "matters" and "subjects" interchangeably).

If Initiative Petition 15-17 is viewed as containing two subjects -- a tax on millionaires and how to spend it -- as framed, the two are not severable and are mutually dependent. This is so because, although the tax could "stand independently," see Petranich, 183 Mass. at 220, the spending matter could not.  The latter merely places conditions on the revenue raised by the tax; without the tax, it would be ineffectual.

There is no requirement, however, that our analysis be controlled by the structure of the petition imposed by its proponents.  As discussed, art. 48, The Initiative, II, § 3, as amended by art. 74, speaks of subjects, rather than provisions; a provision may be drafted to concern multiple subjects.  In this regard, Initiative Petition 15-17 contains three subjects, insofar as the spending matter consists of two:  education and transportation.  These two subjects have no apparent interaction, and are "distinct and in their nature separable the one from the other."  Ashley v. Three Justices of the Superior

4

_Court_, 228 Mass. 63, 81 (1917).  Nor can they be deemed "conditions, considerations or compensations for each other." _Warren_ v. _Mayor & Alderman of Charlestown_, 2 Gray 84, 99 (1854). A tax on millionaires, dedicated to funding education, could "stand independently" as its own petition, with an internal mutual dependence.  See _Petranich_, 183 Mass. at 220.  The same is true of a tax on millionaires that funded transportation projects.  In addition to a taxing provision without spending provisions, therefore, Initiative Petition 15-17 could be severed into two stand-alone petitions, each containing two of its three subjects.  Because Initiative Petition 15-17 could be severed in this way, its three subjects need not all "stand or fall together," _Nolan's Case_, 122 Mass. at 333, and there is no mutual dependence shared among them.

Given that the three subjects in Initiative Petition 15-17 are neither related nor mutually dependent, I am constrained to agree with the court that the petition may not be put before the people.

BUDD, J. (dissenting, with whom Gants, C.J., joins).
Disregarding the plain text of art. 48, The Initiative, II, § 3,
of the Amendments to the Massachusetts Constitution, as amended
by art. 74 of the Amendments, which requires that an initiative
petition contain "only subjects . . . which are related or which
are mutually dependent," the court concludes that, in drafting
this language the delegates to the Constitutional Convention of
1917-1918 inserted the words "or which are mutually dependent"
as superfluous text.  <u>Ante</u> at    ,   .  The court goes on to
conclude that the people may not express their opinion on a one-
section, four-sentence petition because it contains subjects
that are not related.  <u>Ante</u> at    ,   .  That analysis is
flawed.

The constitutional text is the written expression of the
Constitutional Convention's intent to ensure that ballot
questions containing multiple severable distinct, independent,
and unrelated subjects cannot be asked of voters together in one
ballot question, but instead must be severed and asked of voters
independently.[1]  The court's analysis ignores the meaning of

---

[1] Without the "subjects . . . which are related or which are
mutually dependent" requirement, nothing would prohibit a group
of petitioners from placing before the electorate the type of
omnibus legislation that is commonly considered by the
Legislature.  As an example, on April 13, 2018, the Governor
signed into law an omnibus criminal justice reform package sent
to him by the Legislature.  The law consists of 239 different
sections.  See St. 2018, c. 69.  Among its numerous provisions,

"mutually dependent" as it was understood at the time art. 48 was drafted and ratified. Despite the fact that Initiative Petition 15-17's subjects are mutually dependent and are not distinct, independent, and severable, the court incorrectly concludes that the petition cannot be asked of voters even though it falls under no "excluded matter" listed under art. 48, The Initiative, II, § 2, of the Amendments.[2] Prohibiting the

_____

it repeals various mandatory minimum sentence requirements for certain crimes, including those relating to some retail drug offenses and drug paraphernalia. Id. at §§ 47-48, 55. At the same time, it expands mandatory minimum sentences for fentanyl and carfentanil trafficking. Id. at §§ 50-51. It also creates a Statewide sexual assault evidence kit tracking system. Id. at § 11. The bill includes numerous other provisions that could have been voted on separately but instead were packaged together for a single vote. It raises the minimum age a child can be tried in the Juvenile Court, §§ 77-79; reforms the drug-free school zone law, § 57; establishes a process for expunging criminal records, §§ 18, 104, 195; permits survivors of human trafficking to vacate convictions of certain crimes, § 132; limits the use of restrictive housing for prisoners, §§ 85-87, 93-94, 230, 236; prohibits prisons from unreasonably limiting in-person visits between prisoners and families, § 92; raises the felony threshold for malicious destruction of property, § 154; removes the penalty of license suspension from the offense of vandalism, § 152; requires the availability of high school equivalency certificate programming to inmates, § 95; and requires prisons to provide reentry preparation programming at least six months before prisoners' release date, § 93.

[2] Excluded matters under art. 48 include measures that "relate[] to religion, religious practices or religious institutions; or to the appointment, qualification, tenure, removal, recall or compensation of judges; or to the reversal of a judicial decision; or to the powers, creation or abolition of courts; or the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth; or that makes a specific appropriation of money from the treasury of the

people from voting on this petition undermines the legislative power given to the people to draft and enact laws in a manner that is incompatible with the separation of powers principles set forth in art. 30 of the Massachusetts Declaration of Rights.

For these reasons I dissent.

1. The meaning of "mutually dependent" in art. 48. We have recently held that a petition is not mutually dependent if its provisions can "exist independently." Gray v. Attorney Gen., 474 Mass. 638, 648 (2016). However, while clarifying the circumstances where a petition's subjects are not mutually dependent, our modern jurisprudence provides little explanation for the reverse, i.e., the circumstances in which a petition's subjects are "mutually dependent."

"A constitutional amendment['s] . . . 'words are to be given their natural and obvious sense according to common and approved usage at the time of its adoption.'" Mazzone v. Attorney Gen., 432 Mass. 515, 526 (2000), quoting General Outdoor Advertising Co. v. Department of Pub. Works, 289 Mass. 149, 158 (1935). A review of case law prior to and during the time that art. 48 was ratified demonstrates that, contrary to

---

commonwealth" and matters relating to art. 18 of the Amendments to the Massachusetts Constitution, art. 48 itself, provisions in the Constitution specifically excluding matters from popular initiative and referendum, and certain rights in the Massachusetts Declaration of Rights. Art. 48, The Initiative, II, § 2.

the court's interpretation, "mutually dependent" has a specific meaning distinct from "related."  See, e.g., Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 81 (1917).

The concept of mutual dependence as applied to legislation has its roots in the doctrine of severability.  Whenever a court determines that a portion of a statute is unconstitutional, it must consider whether that portion is severable from the rest and determine whether the remainder of the statute may be left intact.  Prior to 1854, many courts simply severed unconstitutional provisions from statutes, assuming that "full effect will be given to such as are not repugnant to the [C]onstitution."  Bank of Hamilton v. Lessee of Dudley, 27 U.S. 492, 526 (1829).  See Shumsky, Severability, Inseverability, and the Rule of Law, 41 Harv. J. on Legis. 227, 232 (2004) (Shumsky); Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L. Rev. 76, 79 (1937) (Stern).

However, Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99 (1854), was "particularly important to the development of modern severability doctrine," providing a "vexing exception" to the general rule permitting the severability of constitutional clauses from those held to be unconstitutional.  Shumsky, supra at 233.  See Stern, supra at 79-80.  In Warren, the court held that the part of a State statute annexing Charlestown to Boston was invalid because it conditioned the annexation on the

maintenance of representation in the Legislature in a manner that violated the Massachusetts Constitution.  The court reasoned that the presumption of severability

> "must be taken with this limitation, that the [statute's] parts, so held respectively constitutional and unconstitutional, must be wholly independent of each other. [For] if they are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them" (emphasis added).

Warren, supra at 99.  The court concluded that because the "various provisions of the act, . . . all providing for the consequences of . . . annexation, . . . are connected and dependent[,] . . . look to one object and its incidents, and are so connected with each other," the drafters and enactors of the legislation could not have intended the dysfunctional but constitutionally valid statutory remnant to stay in force and struck down the entire statutory enactment.  Id. at 100, 107.

After 1854, the court sometimes simplified the language originally used in Warren to refer to portions of statutes that were not distinct and independent.  Over time, the phrase originally expressed as "mutually dependent and connected" was sometimes expressed as "mutually dependent."  See Ashley, 228 Mass. at 81; Nolan's Case, 122 Mass. 330, 332-333 (1877).

Thus, based on Warren and its progeny, "mutually dependent" subjects are those that, if separated from one another, would no longer convey the meaning or purpose of the proposition.[3]  See Ashley, 228 Mass. at 81 ("the two parts are distinct and in their nature separable the one from the other and are not so interwoven and mutually dependent" [emphases added]); Warren, 2 Gray at 100 ("various provisions of the act . . . , all providing for the consequences of [another provision], more or less immediate or remote, are connected and dependent; the different provisions of the act look to one object and its incidents, and are so connected with each other").  Each mutually dependent provision is reliant on the others to express its singular meaning.  In other words, there is no way to separate the provisions in legislation with mutually dependent subjects and still have the law.  See Commonwealth v. Petranich, 183 Mass. 217, 220 (1903) (provisions dependent where severance would mean "so chang[ing] the character of the original" legislation "that the [drafters and enactors] would not be

_____

[3] The court cites to Warren v. Mayor & Alderman of Charlestown, 2 Gray 84, 99 (1854), signaling that it understands the relationship between the severability of portions of statutes deemed to be unconstitutional, and the term "mutually dependent" in art. 48.  However, its application of the case is flawed.  As explained infra, Warren supports the conclusion that all aspects of the instant petition are mutually dependent.

presumed to have enacted [one provision] without the other").[4]

2. <u>Mutual dependence in modern art. 48 case law</u>. As discussed <u>infra</u>, in most of the cases interpreting art. 48's requirement that petitions contain only "subjects . . . which are related or which are mutually dependent," the court has concluded that a petition met the relatedness test, and therefore has not necessarily discussed the mutual dependence prong. However, where the court has concluded that the petition does <u>not</u> meet either prong (and, therefore, cannot be asked of voters), it has either expressly or implicitly considered whether the petition "contains only subjects . . . which are mutually dependent" in a manner consistent with the term as it was understood in 1917.

For example, in <u>Gray</u>, 474 Mass. at 648, separately from our

---

[4] The regular use of the term "mutually dependent" by courts to describe severability of statutes at the time of the 1917-1918 Constitutional Convention alone is sufficient to connect the term as used in art. 48 with the debates among the delegates regarding the danger of combining of numerous unrelated, distinct, and independent proposals into a single ballot question for an up or down vote. However, it is interesting to note that this court applied the "mutually dependent" test to determine if provisions of a statute were severable in an opinion that was released during the Constitutional Convention. See <u>Ashley</u> v. <u>Three Justices of the Superior Court</u>, 228 Mass. 63, 66 (1917). Further, John W. Cummings, who represented the petitioner in the <u>Ashley</u> case, was also the chair of the Constitutional Convention's committee on initiative and referendum. 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at ix, 2 (1918) (Constitutional Debates). As chair of that committee, he would have played a major role in seeing the written expression of what would become art. 48 through the Constitutional Convention's proceedings.

determination that the petition contained subjects that were not related, we analyzed whether it contained subjects that were mutually dependent:

> "An initiative petition properly may contain only subjects 'which are related or which are mutually dependent.' Art. 48, The Initiative, II, § 3[, as amended by art. 74]. The two subjects in this petition are clearly not 'mutually dependent.' In fact, the opposite seems true. That is, whether the diagnostic assessment tests are based on the common core standards or some previous set of academic standards -- the focus of sections 1 through 3 of the petition -- will not affect in any way the commissioner's obligation under section 4 to release before the start of every school year all of the previous year's test items in order to inform educators about the testing process; the commissioner's obligation will exist independently of the specific curriculum content on which the tests are based."

The "exist independently" test is the same as the mutual dependence requirement from Warren and its progeny. See, e.g., Ashley, 228 Mass. at 81 (no mutual dependence where "the two parts are distinct and in their nature separable"); Petranich, 183 Mass. at 220 (one part of statute not dependent on another where other parts "may well stand independently of it").

In Carney v. Attorney Gen., 447 Mass. 218, 226 (2006), S.C., 451 Mass. 803 (2008), the court stressed that the relatedness limitation only "requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls" (emphasis added). In other words, because each law in an "aggregation of [proposed] laws" could inherently "exist independently," Gray, 474 Mass. at

648, the different proposed laws that make up the aggregation are not mutually dependent and therefore must be related in order to survive the two-prong test.  See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 218 (1981) (where it is obvious that there is packaging of independent proposals, proper question is whether those proposals are sufficiently related).

The court's conclusion that relatedness and mutual dependence are one and the same appears to stem partially from a misinterpretation of cases in which mutual dependence is not at issue.[5]  In many cases where we concluded that a petition contained related subjects and therefore met the first prong of the two-pronged disjunctive test, we used a "related subjects" or "relatedness requirement" heading.  See, e.g., Dunn v. Attorney Gen., 474 Mass. 675, 679 (2016); Hensley v. Attorney Gen., 474 Mass. 651, 657 (2016); Abdow v. Attorney Gen., 468 Mass. 478, 498 (2014); Albano v. Attorney Gen., 437 Mass. 156, 161 (2002); Massachusetts Teachers Ass'n, 384 Mass. at 218.

The court did not evaluate the "mutually dependent" requirement in these cases; thus, the court should not look to these cases for an analysis of mutual dependence, nor should it assume that the two prongs mean the same thing.  In Gray, supra

---

[5] The court's conflation of relatedness and mutual dependence is discussed further, in part 4, infra.

at 644, the court used the heading "relatedness" in analyzing the subjects in the petition before the court. There, whether the subjects were related was the operative question because the petition's provisions were plainly not mutually dependent, but instead, distinct and independent. Id. at 648.

The same is true in Carney, where the court considered the "relatedness limitation" in art. 48 because the provisions of the petition were not mutually dependent. See Carney, 447 Mass. at 226 ("relatedness limitation requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls" [emphasis added]). The court's suggestion that we can read "or which are mutually dependent" out of the Constitution based on the headings in cases in which there was no need to discuss mutual dependence in any detail if at all is hazardous and has no jurisprudential support.

3. This petition "contains only subjects . . . which are mutually dependent." The subjects in this one-section, four-sentence petition are mutually dependent because the subjects cannot be severed without changing the meaning of the petition. Cf. Warren, 2 Gray at 99-100. Standing alone, each provision means something different from the provisions together. Cf. id.

Attempting such a separation proves the point. It is possible to ask voters: "Should the people adopt a tax on

incomes exceeding one million dollars?"  But the remaining portions of the petition, regarding how the money should be spent, cannot stand on their own.  See Gray, 474 Mass. at 648 (rejecting petition after considering whether propositions could "exist independently").  What is left is a portion of a proposition regarding whether the people should dedicate some nonexistent revenue to education and transportation.  This remaining partial proposition would not propose a "constitutional amendment" or "law," as required by art. 48, but instead would be no more than a policy question, which would not be a valid exercise of the legislative power under art. 48.  See Paisner v. Attorney Gen., 390 Mass. 593, 601 (1983), citing Cohen v. Attorney Gen., 357 Mass. 564, 578 (1970) ("nonbinding expression of opinion . . . [is] a plebiscite or declaration . . . and is not an appropriate subject for the popular initiative").

If the remaining partial proposition were to be refashioned so as to ask questions that would propose a "constitutional amendment" or "law," they would necessarily be different from the question presented by the petitioners.  For example, questions regarding whether voters would like an additional amount of existing revenue (without a new source of revenue) to go toward education or to transportation, or both, would be entirely different from the one presented by the petitioners.

Similarly, separating the question so as to ask about two separate taxes, one to fund education and one to fund transportation, also would fundamentally alter the question contained in the original petition. For example, rather than one four per cent tax to fund both education and transportation, the proposal could be severed to ask voters (1) whether to impose a two per cent tax on incomes over $1 million to fund education spending; and (2) whether to impose a separate two per cent tax on incomes over $1 million in order to fund transportation spending. Assuming both passed, the Legislature would not have the latitude accorded it by the original proposed law to spend on the two identified areas as it saw fit, and instead would be limited to spending the funds raised specifically for each area regardless of the particular needs in each area.

Thus, there is no way to separate the question into subjects and still have the same question -- the petition does not have the same meaning if its subjects are separated. See Petranich, 183 Mass. at 220 (provisions dependent where severance would mean "so chang[ing] the character of the original statute that the [drafters and enactors] would not be presumed to have enacted [one provision] without the other"). As in Warren, 2 Gray at 100, the various provisions of the instant petition all "look to one object and its incidents."

They are "mutually connected with and dependent on each other, as conditions, considerations or compensations for each other." Id. at 99.  See Ashley, 228 Mass. at 81 ("the two parts are distinct and in their nature separable the one from the other and are not so interwoven and mutually dependent as to require the belief that the Legislature would not have enacted the one without the other"); Nolan's Case, 122 Mass. at 333, citing Warren, supra at 84 ("the two parts of this enactment are not distinct and independent, but . . . are mutually dependent and must stand or fall together" [emphasis added]).

The court relies on Edwards v. Bruorton, 184 Mass. 529 (1904), for the proposition that "the source of funds for a desired public expenditure could be severed from the purpose of the expenditure." Ante at   ,   .  However, a close reading of Edwards reveals that the opinion does not go that far.  In Edwards, the court was called upon to determine the severability of parts of an 1891 special act.  The act sought to "provid[e] for the expenditure of money for the benefit of the public" by granting the city of Boston the power to take land by eminent domain and to issue bonds for public works projects.  Edwards, supra at 531.  See St. 1891, c. 323, §§ 1-3, 10, as amended by St. 1892, c. 418, §§ 1, 5.  The act also provided the city with the power to make an assessment on property abutting certain new road construction projects that could be spent to pay for the

improvements.  Edwards, supra.  See St. 1891, c. 323, §§ 10, 14-17, as amended by St. 1892, c. 418, §§ 5, 7-10.  The taxing provision had been held unconstitutional in an earlier case, and the court concluded that the remaining provisions could stand on their own, "leaving payment to be provided for in a constitutional way."  Edwards, supra.

Unlike the provisions in the ballot question at issue in this case, a State's grant of powers to a municipality to take land, to float bonds, and to make special assessments on certain properties could plainly exist independently of one another. See Loeb v. Columbia Township Trustees, 179 U.S. 472, 489 (1900), cited in Edwards, 184 Mass. at 531 ("The power to issue bonds to raise the money, and the mode in which the township should raise the necessary sums to pay the bonds when due . . . are distinct and separable matters" [emphasis added]).  In contrast, although one part of the instant petition (and the statute at issue in Warren) could stand alone, the remainder could not; the remainder acts only as a modifier, changing the meaning of that which could stand independently.[6]

---

[6] To the extent that the reasoning in Edwards v. Bruorton, 184 Mass. 529 (1904), is inconsistent with the reasoning of Warren, the inconsistency may be explained by the context in which Edwards was decided.  At the time of Edwards, many States had authorized cities to make public improvements, engage in planning, and, on occasion, tax abutters in a manner later determined to be unconstitutional, to help pay for street improvements.  See, e.g., Loeb v. Columbia Township Trustees,

Based on the language of the petition, rather than seeking to impose a tax combined with the broad authority to spend the associated revenue on all areas of State government, the ballot initiative grants the Legislature with power to assess a particular tax and limits the areas where the revenue from that tax can be spent. The petitioners want to ask the electorate whether <u>this</u> question should be law, and the electorate has the

---

179 U.S. 472, 489 (1900). When the same statute made such an assessment and also provided the authority to float bonds to pay for infrastructure projects, many courts first concluded that all of these provisions were mutually dependent. See, e.g., <u>Loeb</u> v. <u>Trustees of Columbia Township, Hamilton County, Ohio</u>, 91 F. 37, 45 (S.D. Ohio 1899). See also <u>Loeb</u>, 179 U.S. at 489 ("There is some ground for saying that the legislature would not have passed the act without the [assessment] section").

The <u>Edwards</u> court acknowledged that its decision in the case regarding mutual dependence was "not free from difficulty," <u>Edwards</u>, 184 Mass. at 533, and described the case as one "present[ing] difficulties of determination upon the question," <u>id</u>. at 531. However, the court ultimately followed the reasoning of the United States Supreme Court and concluded that the assessment provisions were not mutually dependent on the power to take land and the power to issue bonds. <u>Id</u>., citing <u>Loeb</u>, 179 U.S. 472. In the intervening thirteen years between the enactment of the statute and the court's conclusion that a special benefit assessment was unconstitutional, the city of Boston would have issued many bonds and taken many parcels of land from property owners. Had the court concluded, years later, that all of the provisions of the 1891 special act, as amended, were invalid, the transactions would have been difficult if not impossible to undo. See <u>Loeb</u>, <u>supra</u> at 488-489; A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 66 (2012) (Scalia & Garner) (describing presumption of validity as one that "disfavors interpretations that would nullify the provision or the entire instrument -- for example, an interpretation that . . . would cause a statute to be unconstitutional"). Similar considerations are not present in considering whether the provisions of Initiative Petition 15-17 are mutually dependent.

right under art. 48 to consider whether <u>this</u> question should be law -- not a <u>different</u> question.

4.  <u>The court's conflation of relatedness and mutual dependence in art. 48</u>.  Disregarding the second half of art. 48's requirement that a petition contain "only subjects . . . which are related or which are mutually dependent," the court concludes that the subjects of the petition are unrelated, and thus holds that the ballot question cannot be put before voters.[7]

In explaining its view that "or which are mutually dependent" is surplusage,[8] the court stresses that "[t]he words . . . were added at the last moment, when the 'related subjects' language was 'referred back' to the committee on form and phraseology," ostensibly to show that the addition was not given much thought.  <u>Ante</u> at     , quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 953 (1918) (Constitutional Debates).  Yet, as the chair of that committee explained when they released the draft, the changes were "made purely and simply to carry out what the committee believed to be

---

[7] The court asserts that this test in art. 48 does not "impose a separate requirement that may be satisfied even if the subjects of a petition are not related."  <u>Ante</u> at    .  Nonetheless, the court asserts that the provisions of the petition are not mutually dependent.  <u>Ante</u> at    .

[8] This view ignores a basic tenet of statutory interpretation that every word is to be given effect and none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.  Scalia & Garner, <u>supra</u> at 174.

the wishes of the Convention." Constitutional Debates, supra at 960 (remarks of Augustus P. Loring). Far from adding surplusage, that committee "cut down [by] about [fifteen] per cent" the text of the document. Id. at 959. "Unnecessary words were cut out," not put in. Id. at 960.

In redrafting the text, the committee on form and phraseology worked closely with those who had been active in the earlier debates, including the sponsor of the initiative and referendum, Joseph Walker, as well as Robert Luce and Josiah Quincy. Id. The Committee also worked closely with the advisor to the Convention, Lawrence B. Evans. Id. Evans explained that the role of that committee was to reduce "the amount of litigation which is due entirely to the careless drafting of constitutions or statutes." Evans, The Massachusetts Constitutional Convention, 11 Law. Libr. J. 51, 56 (1918). Evans explains that, instead of adding unnecessary words, the committee's role was to counter the insistence among delegates "who have not had the benefit of legal training and are afraid to trust the concise and exact language of the Committee" to insert "clauses which add nothing to the amendment except superfluous words." Id.

Our cases have explained that the requirement that a petition "contains only subjects . . . which are related or which are mutually dependent" was put in place in order to limit

the dangers of logrolling.  See Dunn, 474 Mass. at 679; Carney, 447 Mass. at 227-229.  Reasonable minds may disagree as to the precise definition of "logrolling"; however, based on the language of the constitutional text, we know that by enacting and ratifying art. 48, the delegates were concerned about the inclusion of multiple severable distinct, independent, and unrelated proposals combined together to be asked of voters together in one ballot question.  See art. 48, The Initiative, II, § 3, as amended by art. 74.  This written expression is consistent with the definition of "logrolling" that we have used in our cases, which also reference the severability element,[9] as well as the understanding of the delegates who were concerned

---

[9] "'Logrolling' . . . is defined as '[t]he legislative practice of including several propositions in one measure or proposed constitutional amendment so that the legislature or voters will pass all of them, even though these propositions might not have passed if they had been submitted separately'" (emphasis added).  Carney v. Attorney Gen., 447 Mass. 218, 219 n.4 (2006), quoting Black's Law Dictionary 960 (8th ed. 2004).  See Dunn v. Attorney Gen., 474 Mass. 675, 679 (2016) (same); Abdow, v. Attorney Gen., 468 Mass. 478, 502 n.19 (same).

"Logrolling" has also been defined as "the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately" (emphasis added).  Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389, 391 (1958).  Ruud contended that, in States that have single subject rules, "[t]he disposition of money raised by a tax or fee is clearly germane to the subject of the tax and so is an appropriation to administer the tax."  Id. at 428, citing Winter v. Barrett, 352 Ill. 441 (1933).

about logrolling.[10]

5. <u>The court's relatedness analysis</u>. The court's holding rests upon its conclusion that the subjects of the petition are not related, and correctly notes that our jurisprudence has similarly focused on relatedness rather than on mutual dependence. However, that is because, before now, each time that we have concluded that a ballot question was not in compliance with art. 48 because it failed to contain "only subjects . . . which are related or which are mutually dependent," the petition comprised provisions that contained more than one proposition that could have been severed and "submitted separately" to be considered by voters without fundamentally altering the proposed laws. See <u>Gray</u>, 474 Mass. at 647; <u>Carney</u>, 447 Mass. at 231-232; <u>Opinion of the Justices</u>, 422 Mass. 1212, 1221 (1996). Cf. <u>Ashley</u>, 228 Mass. at 81; <u>Petranich</u>, 183 Mass. at 220. In other words, the petitions were not mutually dependent, hence there was little, if anything,

---

[10] See, e.g., Constitutional Debates, <u>supra</u> at 537 (remarks of Francis N. Balch) (suggesting that there be special body to review ballot questions for seven different requirements as to proper form, including one stating that "[t]he measure touches only one subject-matter, or on subject-matters so related <u>as not fairly to require separation</u>" [emphasis added]). Furthermore, it is consistent with the examples given by delegates concerned about logrolling such as the Oregon example provided by Robert Luce. <u>Id</u>. at 567 (discussing "a case in Oregon, where, in order to secure the passage of the single tax, there was hitched to the front of it, like a locomotive to the front of a freight train, a proposal that there should be no more poll or head taxes").

said about mutual dependence in our art. 48 cases.

a. <u>Relatedness in art. 48 jurisprudence</u>. For example, in <u>Carney</u>, 447 Mass. at 219, the court considered whether a petition that (1) would prohibit dog racing in the Commonwealth and (2) would broaden criminal statutes penalizing dog fighting and neglect of dogs met the requirements of art. 48. These two sections of the petition are distinct and could be severed and asked of voters independently without altering their meanings: (1) whether the people should prohibit the practice of legalized dog racing and live betting, and (2) whether the people should broaden the criminal statutes penalizing animal abuse. See <u>id</u>. The court referred to this as an "aggregation of these two very different sets of laws into one petition." <u>Id</u>. at 220. As the two subjects (in separate sections) were severable, i.e., not mutually dependent, the court analyzed the propositions to determine whether they were sufficiently related. <u>Id</u>. at 231. Determining that there was no operational relationship between the provisions and that the petition could not give voters a meaningful choice when voting yes or no, the court concluded that the severable propositions in the petition were not sufficiently related under art. 48, The Initiative, II, § 3, as amended by art. 74, and must be asked of voters separately. <u>Id</u>. at 231-232 & n.23.

Similarly in <u>Gray</u>, 474 Mass. at 638, the court considered

an initiative petition that concerned the use of certain educational standards in defining the educational curriculum of public school students and also concerned the standardized testing process used in school districts.  The petition comprised six sections, many of which contained propositions that could have been severed and asked of voters separately. See id. at 641-643.  For example, at least two separate questions could have been asked without altering their meanings: (1) whether the people should repeal the "Common Core" academic standard; and (2) whether the people should require the annual publication of all the previous year's questions, constructed responses, and essays included in mandatory standardized performance assessment tests.  See id.  Here again, upon determining that the provisions were not mutually dependent, we analyzed whether they were nonetheless sufficiently related to be asked of voters together.  See id. at 644-649.  We concluded that the first few sections (sections 1-3), which essentially sought to rescind a vote of the Board of Elementary and Secondary Education and modify the process for developing and reviewing academic standards, were sufficiently related to a common purpose.  Id. at 647.  However, the section requiring annual publication of test items (section 4) had a different purpose.  Id. at 647-648.  We thus determined that sections 1-3 and 4 were not sufficiently related to be asked of voters

together; the petitioners were required to sever them and ask them of voters independently to satisfy the requirements of art. 48. Id. at 649.

Finally, in Opinion of the Justices, 422 Mass. at 1213-1214, 1220, the court considered an initiative petition that would have (1) reduced compensation for members of the Legislature, (2) required that they receive all of their compensation in the first six months of any year, (3) tied future compensation to Massachusetts median household income, "(4) eliminate[d] or reduce[d] additional compensation for legislative leadership positions, . . . (5) permit[ted] the State Auditor and Inspector General to oversee legislative financial accounts and purchasing activities," and (6) permitted the Inspector General to have oversight power over the commissioner of veterans' services.

Many of these propositions could have been severed from the others and asked of voters independently without changing their meanings, thus they were not mutually dependent. See id. For example, at least four separate questions could have been asked: (1) whether the people should reduce compensation for members of the Legislature; (2) whether the people should eliminate additional compensation for legislative leadership positions; (3) whether the people should permit the State Auditor and Inspector General to oversee legislative financial accounts and

purchasing activities; and (4) whether the people should permit the Inspector General to oversee the commissioner of veterans' services. See id. Therefore, the court considered whether these separate questions were related to a common purpose. Id. at 1220-1221. The court concluded that, at the least, permitting the Inspector General to access the records of the commissioner of veterans' services was not related to legislative accountability and therefore the proposition regarding Inspector General oversight of the commissioner of veterans' services should have been severed from the petition's other propositions and asked of voters separately in order to be valid under art. 48. See id. at 1221.

Thus, although our case law has properly focused on relatedness, the tests articulated to determine whether the subjects of a petition are related need not be applied to this petition, which is not severable.[11] See art. 48, The Initiative,

---

[11] I take no position whether the subjects of the petition are related, except to note that subjects can be both related and mutually dependent. See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 218 n.8 (1981) ("We need not pause to consider whether any subjects which are mutually dependent could ever be said not also to be related"). Further, the question whether subjects are related is often a subjective one. See Dunn, 474 Mass. at 680 ("there is no single 'bright-line' test for determining whether an initiative meets the related subjects requirement"); R. Luce, Legislative Procedure 551 (1922) (discussing difficulty in interpreting single subject rules and noting that "[p]erhaps our language does not permit a more accurate statement of what is meant"); Cooter & Gilbert, A Theory of Direct Democracy and the Single

II, § 3, as amended by art. 74.

b. The fairness inquiry. The fairness inquiry the court undertakes when it asks if it is fair to voters to be asked this question is part of the relatedness analysis. See Gray, 474 Mass. at 644-645, quoting Carney, 447 Mass. at 226, 230-231. It attempts to answer the question: "Do the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters?" Gray, supra, quoting Carney, supra at 226. Any petition that cannot be severed into different questions (like this one) is inherently fair to be voted up or down because there is no other way to ask the question presented. Inherently, the "similarities of [the] initiative's provisions dominate what each segment provides separately" because, of the three "segment[s]" identified by the court, only the segment providing for a tax on high incomes separately "provide[s]" anything at all. See Gray, supra, quoting Carney, supra. The other two "segment[s]," if separated from the first, do not "provide" or stipulate anything; they are merely a condition modifying the consequences of the first segment. See Gray, supra, quoting Carney, supra. It is worth noting that, in fact, contrary to the court's conclusion regarding the "fairness" of asking this question to voters, the

Subject Rule, 110 Colum. L. Rev. 687, 709-712 (2010).

ballot question at issue here is no different from <u>any</u> proposal for a law; that is, it suggests a particular means to achieve a particular end.

Drafters of proposed laws (and constitutional amendments) designed to achieve goals (such as increasing spending on public investments) must choose a means by which to do so. Here the drafters chose a tax on incomes over $1 million. They could have chosen any number of other ways to reach this goal: alternative means to achieve a desired end in any proposed law are always available. If voters do not like the proposed means to achieve a particular end within a ballot question (or do not agree with the particular end proposed), they are, as always, free to vote against the question.

Here, if opponents of the petition wish to achieve increased spending on education and transportation but dislike the proposed means, or wish to provide the Legislature with discretion to invest the revenue on more or fewer areas of public investment than education and transportation, they are free to express their opinion that voters should reject the question, just like in any other ballot question proposal. We should not stifle the policy debate by preventing the people from considering the petition altogether.

The court also suggests that the petition violates the spirit of logrolling because ballot questions seeking to amend

art. 44's prohibition on a graduated income tax were defeated numerous times in the past (most recently in 1994).[12]  In fact, art. 48 is designed to allow petitioners to modify a previously rejected proposal, just as was done here, so that it might be more appealing to voters, provided that it meets art. 48's mode of origination requirements.

Although the requirement in art. 48, The Initiative, II, § 3, as amended by art. 74, that initiative petitions only contain "subjects . . . which are related or which are mutually dependent" prohibits petitioners from tacking on an unrelated, distinct, independent and separate proposal for a law or constitutional amendment to their original proposal as part of one petition, art. 48 in no way prohibits petitioners from attempting to modify or limit a proposal with conditions until they are successful.  In other words, if a majority of voters did not like a certain proposition because of its breadth, but a majority of voters would support the proposition if it were more limited, the more limited proposal may of course be asked.[13]

---

[12] This view ignores the canon of statutory interpretation providing that a "determination of statutory meaning [cannot] be overridden by a judicially perceived, at-large 'spirit' of the law that overcomes its letter."  Scalia & Garner, supra at 343.

[13] The court's opinion appears to allow a ballot question permitting a graduated income tax to be asked of voters alone such that any associated revenue would be available for legislators to spend on all areas of government spending.  But by the court's logic, a question that called for the same tax

For example, a hypothetical gun safety advocacy group that advanced a previously rejected petition to outlaw automatic weapons could not return with a different petition that both outlawed automatic weapons and legalized recreational marijuana because the two subjects are severable and unrelated. That same group, however, could advance a new petition to regulate (rather than prohibit) automatic weapons.

The court contends that this reading of mutual dependence would permit "any collection of provisions that would tax any number of different sources, and would provide funds to some indeterminate list of distinct entities and purposes, should be placed before voters, because the list of provisions would be 'mutually dependent.'" Ante at    . This is a misunderstanding of mutual dependence. To the extent that a petition contained numerous distinct taxes, they would not necessarily be mutually dependent. Also, to the extent that a petition removed the Legislature's spending discretion, the provisions of this question would not likely be mutually dependent, but severable. Furthermore, the delegates to the 1917-1918 Constitutional Convention expressly considered and rejected the contention that the initiative petition process could be used to "provide funds

---

but enumerated each area of government spending in the text would violate art. 48 because it would contain "unrelated subjects" despite the fact that it would be fundamentally the same question with the same outcome.

to some indeterminate list of distinct entities," id., by including "specific appropriation[s]" on the list of matters excluded from the initiative process. Art. 48, The Initiative, II, § 2.

Article 48 permits the people to adopt laws through the initiative process that are properly narrowed to the popular will. To prohibit advocates from asking more limited propositions than others previously rejected by the people ignores the purpose of art. 48 and interferes directly with the democratic process.

6. Article 30 and the people's legislative power under art. 48. Finally, by ratifying art. 48, the people extended the legislative power from the General Court to the people. See art. 48, The Initiative, II; Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 243-247 (1946); Horton v. Attorney Gen., 269 Mass. 503, 514 (1929). With the exception of a list of enumerated "excluded matters" expressly prohibited in Part II, art. 48 provides the people with broad authority to create laws.[14] See art. 48, The Initiative, I, of the Amendments (art.

---

[14] In fact, the Constitutional Convention's decision to move the requirement that a petition contain "only subjects . . . which are related or which are mutually dependent" to the "Mode of Originating" section, art. 48, The Initiative, II, § 3, as amended by art. 74, and away from the "Excluded Matters" section reflects the conscious intent that the provision was not designed to prohibit certain proposed laws from being asked of voters. Constitutional Debates, supra at 960; Convention Doc.

48 provides "the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection").

"The principle of the initiative and referendum in its purity means that the people of this Commonwealth may have such laws and may have such a Constitution as they see fit themselves to adopt."  Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 199 (1976), quoting Constitutional Debates, supra at 16 (remarks of Joseph Walker).  By citing Warren, the court acknowledges that the correct lens to look at mutual dependence is through severability.  Ante at note 8.  As mentioned supra, until now, in every case in which we have declared that a petition could not be submitted to the people, the provisions were severable and could be asked separately without changing the meaning of each provision.

By reversing the Attorney General's decision to certify the instant petition, the court fundamentally interferes with the ability of the people to exercise the constitutionally granted legislative power under art. 48.  Because the proposed question is not severable, the effect of the court's holding is to turn art. 48's mode and form requirements into absolute disqualifiers; that is, rather than having the option of putting the question into what the court considers proper form, the

No. 370, at 2-3.

question cannot be asked at all. See Horton, 269 Mass. at 514 ("The popular initiative relates to legislation. . . . The judicial department of government cannot interfere with the ordinary processes of legislation"). The court's opinion unduly operates to "deprive the people of a 'meaningful way' to express their will." Carney, 447 Mass. at 230.[15] I cannot support an interpretation that results in such an intrusion by the judicial power into the legislative power without a clearer expression in art. 48 providing the judicial department with that authority.

7. Conclusion. "[W]hether [the substance of this petition] is wise as a matter of economic and social policy is, of course, not subject to judicial review." Town Taxi Inc. v. Police Comm'r of Boston, 377 Mass. 576, 585 (1979).[16] The

---

[15] Although the delegates at the 1917-1918 Constitutional Convention expressly rejected a single subject rule, instead opting for a rule requiring there to be "related" or "mutually dependent" subjects, the court's opinion is written as if our Constitution does in fact provide a single subject rule. See Massachusetts Teachers Ass'n, 384 Mass. at 220.

[16] It is well worth noting that at the time of the debates over art. 48, many proponents of the initiative and referendum favored it because it would let voters vote on the exact type of question being posed by the ballot question in this case, and opponents opposed it for that same reason. However, the opponents lost. Albert E. Pillsbury was one of the most hard-line opponents of the initiative and referendum provisions. Pillsbury viewed the debate as "between the believers in constitutional representative government on the one hand and socialistic democracy on the other." Constitutional Debates, supra at 604. He believed that "[t]he ultimate effect if not the object of the initiative and referendum, say what you will, is to enable a majority at the polls to appropriate the property

court's holding overrides the Constitution's text, which limits matters excluded from the initiative petition only to those thoughtfully and specifically enumerated under art. 48, The Initiative, II, § 2, and permits an initiative petition that "contains only subjects . . . which are mutually dependent." art. 48, The Initiative, II, § 3, as amended by art. 74.

I see nothing in art. 48, The Initiative, II, § 3, as amended by art. 74, that prohibits the power of the people to accept or reject this ballot question in November; therefore, I dissent.

---

of those who have it to the use of those who want it.  With this weapon in their hands they can do . . . anything."  Id. at 613.

On the other side of the issue was Grenville S. MacFarland, an editorial writer for the Boston American, who was once referred to as "the most influential force for the [initiative and referendum provisions]."  R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, at 42 (1923).  MacFarland sent a personal letter to all candidates for the Legislature expressing concerns about economic inequality in the industrial era:

> "In my judgment, and I hope in yours, that convention will be a failure if it does not enable us to obtain the initiative and referendum by which the direct power of the whole body of citizens may supplement the present form of representative government and keep it free from those vices which the unequal distribution of wealth and the resulting concentration of financial and political power, through the rise of powerful public service and industrial corporations, have introduced into our body politic and are now threatening our representative form of government."

Id. at 42-43.